COURT OF APPEALS OF VIRGINIA

Present:  Chief Judge Moon, Judge Coleman and Senior Judge Cole
Argued at Richmond, Virginia


RODNEY R. WINFIELD

                                              OPINION BY
v.    Record No. 2408-96-2            JUDGE MARVIN F. COLE
                                          NOVEMBER 4, 1997
HENRY O. URQUHART and
 BARBARA T. URQUHART


          FROM THE CIRCUIT COURT OF DINWIDDIE COUNTY
                    Thomas V. Warren, Judge

          John B. Chappell for appellant.

          Lawrence D. Diehl for appellees.

          Amicus Curiae:  Robert Winfield and Lois
          Winfield; (Paul C. Bland; Beverly M. Murray,
          on brief), for appellant.


     Appellant contends that the trial judge erred in finding

that he withheld consent to adoption against the best interests

of his minor children and erred in finding that adoption was in

the best interests of the children.  For the reasons that follow,

we affirm the trial judge.

     "The trial [judge]'s decision, when based upon an ore tenus

hearing, is entitled to great weight and will not be disturbed on

appeal unless plainly wrong or without evidence to support it."

Frye v. Spotte, 4 Va. App. 530, 537, 359 S.E.2d 315, 319-20

(1987).  See also Lyle v. Eskridge, 14 Va. App. 874, 876, 419

S.E.2d 863, 864 (1992) (adoption determination).  On appeal, we

view the evidence in the light most favorable to the party

prevailing below, giving it all reasonable inferences fairly

deducible therefrom.  See Farley v. Farley, 9 Va. App. 326, 328,

387 S.E.2d 794, 795 (1990).

                                    I.

     Appellant, Rodney R. Winfield, was convicted of the

July 2, 1990 first degree murder of Ernestine Tucker Hardy, the

biological mother of BST (dob 7-5-86) and BRT (dob 2-24-90), who

are the subjects of this proceeding.  Appellant was also

convicted of malicious wounding and using a firearm during the

commission of malicious wounding, both of which occurred at the

same time as the murder.  As a result, appellant received a

twenty-seven year prison sentence for which he is currently

incarcerated.  Appellant is the natural father of BST and BRT.

Although appellant is currently eligible for parole, prior to the

June 18, 1996 hearing, parole had twice been denied.

     Following the natural mother's murder, BST and BRT were

placed in the custody of the appellees, Henry O. and Barbara T.

Urquhart, where they have remained continuously.  Barbara was the

natural mother's sister.  On May 15, 1992, the Urquharts were

awarded legal custody of the minor children by court order.

     On October 24, 1994, the Urquharts filed a petition for

adoption.  Samuel Hardy, who was married to the children's

natural mother and was their stepfather and legal guardian,

consented to the adoption on March 28, 1995.  Appellant withheld

consent, and, due to his incarceration, was appointed a guardian

ad litem to represent his interests at a June 18, 1996 hearing on

the Urquharts' petition for adoption.

                                    2

Pursuant to Code § 63.1-223, the trial judge ordered a preliminary investigation by the local social service agency. In its March 17, 1995 report, the agency found the Urquharts suitable adoptive parents and recommended that they be allowed to adopt the minor children. The Urquharts have a longstanding history of gainful employment with the same employers, for twenty-one and sixteen years, respectively. They live in a three-bedroom, well-maintained home, are actively affiliated with a local church, have provided financial support and medical care to the children, and have received favorable responses from references contacted by the agency.

At the June 18, 1996 ore tenus hearing, John P. Dwyer, a licensed clinical psychologist, provided expert testimony regarding the results of psychological evaluations of the minor children. Dwyer opined that the children were "functioning very well" under the Urquharts' care and custody. The children "describe [the Urquharts] very warmly." Dwyer described the Urquharts as the children's "psychological parent[s]," and, specifically, Mr. Urquhart as their psychological or emotional father. According to Dwyer, "their mother is dead, their father is in prison, so they have the need for parents and the Urquharts appear to me to have stepped in very well given the circumstances."

In addition, Dwyer testified that the children "visit the Winfields [the paternal grandparents], and they visit their

3

father in prison . . . [and] the children have said that they like that."  When asked to comment on the effect of an adoption, Dwyer opined that "if the children not being adopted places them in more vulnerability for the situation to change from what it is now, that would cause some difficulty."  Dwyer stated:

> If there is a question of who [BST, the older child,] might live with and who has the power to make those decisions, that would cause her -- it would bring up all -- When her mother died and her father went to prison, her life changed dramatically at a pretty important time developmentally.  If you say well, it can go this way, it could go that way, not only is her future sort of in jeopardy but her present is too, because it is going to cause her more anxiety, more difficulty because, again, she has gotten comfortable and confident in her situation.

Appellant testified that, barring his early release on parole, his mandatory release date is in the year 2003.  This date, however, is subject to appellant's good behavior while in prison.  Based on the birth years of the minor children, they will be seventeen and thirteen, respectively, if appellant is released in 2003.

The children's guardian ad litem recommended adoption and represented that "in the best interest of the girls, that they're entitled to legal stability, they're entitled to have legal parents."  Because visitation with appellant and the Winfields appeared positive, the guardian recommended that the trial court fashion an order requiring continued visitation.

After hearing evidence, the trial judge ruled that appellant

4

"unreasonably withheld" consent to adoption "to the detriment of the children," and he granted the Urquharts' petition for adoption. In the final order, the trial judge ordered that regular visitation be allowed for appellant and appellant's parents, Robert and Lois Winfield, the minor children's grandparents.

## II.

"No petition for adoption shall be granted, except as hereinafter provided in this section, unless written consent to the proposed adoption is filed with the petition. Such consent shall be signed and acknowledged before an officer authorized by law to take acknowledgments." Code § 63.1-225(A).

"Consent shall be executed . . . [b]y the parents or surviving parent of a child born to parents who were not married to each other at the time of the child's conception or birth."
Code § 63.1-225(D)(2).

> If after consideration of the evidence, the court finds that the valid consent of any person or agency whose consent is hereinabove required is withheld contrary to the best interests of the child as set forth in § 63.1-225.1, or is unobtainable, the court may grant the petition without such consent . . . [t]wenty-one days after personal service of notice of petition on the party or parties whose consent is required by this section . . . .

Code § 63.1-225(F).

> In determining whether the valid consent of any person whose consent is required is withheld contrary to the best interests of the child, or is unobtainable, the court shall consider whether the failure to grant

5

the petition for adoption would be detrimental to the child. In determining whether the failure to grant the petition would be detrimental to the child, the court shall consider all relevant factors, including the birth parent(s)' efforts to obtain or maintain legal and physical custody of the child, whether the birth parent(s)' efforts to assert parental rights were thwarted by other people, the birth parent(s)' ability to care for the child, the age of the child, the quality of any previous relationship between the birth parent(s) and the child and between the birth parent(s) and any other minor children, the duration and suitability of the child's present custodial environment and the effect of a change of physical custody on the child.

Code § 63.1-225.1.

In Hickman v. Futty, 25 Va. App. 420, 426-31, 489 S.E.2d 232, 234-37 (1997), we analyzed prior case law as it applies to the legislature's recently enacted statutory factors.

Th[e] factors [in Code § 63.1-225.1] encompass both aspects of the standard developed in the prior case law: a court must consider the relationship between the child and the prospective adoptive parents as well as the relationship between the child and the non-consenting parent. A finding with respect to only one of these relationships is insufficient. Under Code § 63.1-225.1, as under the prior case law, not only must the prospective adoptive placement serve the child's best interests, but the continued relationship with the non-consenting parent must prove to be detrimental. Detriment is determined, as it was under the prior case law, by considering the non-consenting parent's fitness, or ability, to parent the child as well as the relationship the non-consenting parent maintains with the child and other children, if any.

Id. at 431, 489 S.E.2d at 237.

6

> [T]he factors enumerated in Code § 63.1-225.1
> compel the court to consider the child's best
> interests vis-a-vis both the prospective
> adoptive parents and the parent whose consent
> to the adoption is being withheld. Where the
> evidence reveals that adoption would be in
> the child's best interests and the continued
> relationship with the non-consenting parent
> would be detrimental, it follows that the
> failure to grant the adoption would be
> detrimental to the child. In such a case,
> the conclusion that consent is withheld
> contrary to the child's best interests is
> compelled.

Id. at 432, 489 S.E.2d at 237-38.

In Dyer v. Howell, 212 Va. 453, 184 S.E.2d 789 (1971), the Supreme Court affirmed the adoption of a child by the child's maternal aunt and uncle, over the objection of the natural father. Although the father had killed the child's mother, he was found not guilty by reason of insanity. Twenty-one months after the murder and seven months after his trial, the father was deemed mentally competent and no longer mentally ill. See id. at 454, 184 S.E.2d at 791. Following his release, the father became gainfully employed, bought a home, remarried, and had another child, after which he contested the adoption by the maternal aunt and uncle and petitioned for custody of his first child. See id. at 456, 184 S.E.2d at 792. The Supreme Court held that the trial judge "was warranted in holding that" the natural father's consent to adoption "was being withheld contrary to [the child's] best interests and in granting the adoption without such consent." Id. at 459, 184 S.E.2d at 794. The Court explained:

> From . . . the . . . evidence before the
> court, it is clear that the one thing for

7

which the welfare of [the child] cries out is permanent stability in proper surroundings. It is problematical that [the child] could get that stability in [the natural father's] home. She can get it in the [adoptive parents'] home.

To deny the adoption by the [child's maternal aunt and uncle] now, against the possibility that [the father] might at some unknown time in the future be able to prove himself entitled to a change of custody, would be to deny [the child] contrary to her best interests, the security and stability she so desperately needs.

Id. at 459, 184 S.E.2d at 793-94.

[T]o say that a certain action is contrary to the best interests of a child means that it is action opposed to [the child's] interests. When consent to adoption is withheld contrary to a child's best interests, it means that the person so withholding is "obstinately self-willed in refusing to concur" and that he is acting prejudicially to the child's interests.

Malpass v. Morgan, 213 Va. 393, 398-99, 192 S.E.2d 794, 798 (1972) (citation omitted) (reversing grant of adoption to natural mother and stepfather over natural father's objection; trial court found that homes of both natural parents were morally suitable and that non-consenting natural father was not unfit)."Finding that the continuation of a poor, strained or non-existent parent-child relationship will be detrimental to a child's future welfare is difficult. No one can divine with any assurance the future course of human events. Nevertheless, past actions and relationships over a meaningful period serve as good indicators of what the future may be expected to hold. Trial courts may, when presented with clear and convincing evidence,

8

make an informed and rational judgment and determine that the continued relationship between a child and a non-consenting parent will be detrimental to the child's welfare." Linkous v. Kingery, 10 Va. App. 45, 56, 390 S.E.2d 188, 194 (1990) (quoting Frye, 4 Va. App. at 536, 359 S.E.2d at 319).

III.

Appellant contends that the evidence was insufficient to establish that the children's continued relationship with him was detrimental. Under the facts of this case, we find that the evidence supports the trial judge's decision that appellant unreasonably withheld consent to the detriment of the children.

When weighing the evidence, the fact finder is not required to accept entirely either party's account of the facts. See Barrett v. Commonwealth, 231 Va. 102, 107, 341 S.E.2d 190, 193 (1986). The fact finder may reject that which it finds implausible, yet accept other parts which it finds to be believable. See Durham v. Commonwealth, 214 Va. 166, 169, 198 S.E.2d 603, 606 (1973). Moreover, even though appellant's testimony regarding the quality of care he provided to the children before murdering their mother "was uncontradicted and unimpeached, the trier of fact did not have to accept this version of the facts simply because it was the only version supplied." Harrell v. Commonwealth, 11 Va. App. 1, 9, 396 S.E.2d 680, 684 (1990) (citing Crumble v. Commonwealth, 2 Va. App. 231, 236, 343 S.E.2d 359, 362 (1986)).

Initially, we review the factors listed in Code § 63.1-225.1 that the court should consider "[i]n determining whether the failure to grant the petition would be detrimental to the child." Those factors include: (1) the birth parent's efforts to maintain legal and physical custody; (2) whether the

10

birth parent's efforts to assert parental rights were thwarted by other people; (3) the birth parent's ability to care for the children; (4) the ages of the children; (5) the quality of the prior relationship between the children and the birth parent; (6) the duration and suitability of the children's present custodial environment; and (7) the effect of a change of physical custody on the children. See id.

By murdering the natural mother and becoming incarcerated, appellant prevented himself from maintaining or gaining custody. As an incarcerated prisoner, appellant had, and still has, no ability to care for the children. The children, who were very young at the time of the murder, are still too young to appreciate their situation and assist in making a reasoned choice. Due to the young age of the children when their mother was murdered, the prior relationship between appellant and BST was of negligible quality and appellant's relationship with BRT was practically non-existent. At the time of the hearing, the children had been in the custody of the Urquharts for six years. The Urquharts have provided a suitable and nurturing environment for the children. Dwyer's expert testimony revealed that "difficulty" would arise should a failure to allow the adoption make the children more vulnerable to a change in the future. The older child, BST, "has gotten comfortable and confident in her situation," and she could face anxiety and difficulty should a future change affect that comfort. Accordingly, application of

11

the Code § 63.1-225.1 factors to appellant's situation favors the Urquharts, the adoptive parents, and demonstrates that a failure to grant the petition would be detrimental to the children.

However, because factors listed in Code § 63.1-225.1 are not exclusive, we look to other factors unique to this case. Both the Supreme Court and this Court have expressed the view that, before requiring a showing that a relationship with the non-consenting parent would be detrimental, there must be "no question of the fitness of the non-consenting parent and [a showing that the non-consenting parent] has not by conduct or previous legal action lost his rights to the child." Malpass, 213 Va. at 399, 192 S.E.2d at 799. See also Jolliff v. Crabtree, 224 Va. 654, 657, 299 S.E.2d 358, 360 (1983) (reversed trial court's grant of adoption, noting that natural father was not solely responsible for lack of contact and support where mother unilaterally took child away and concealed his whereabouts); Ward v. Faw, 219 Va. 1120, 1124-25, 253 S.E.2d 658, 661 (1979) (noting absence of allegation of unfitness or showing that by conduct or legal action the father had lost his parental rights); Lyle, 14 Va. App. at 876, 419 S.E.2d at 865 (absent a showing of unfitness, movant must show continued parent-child affiliation detrimental to child's welfare).

> [A] determination under Code § 63.1-225(D)
> that a natural parent is withholding consent
> to an adoption contrary to the best interests

12

of a child involves the careful application of a series of guiding principles rather than a single one.  The paramount concern is the welfare of the child, but the child's welfare must be balanced against the rights of the non-consenting natural parent.  To reach that balance the court must first determine that the proposed adoption will promote the best interests of the child; that is, that the adoption will advance or contribute to the child's interests.  Thereafter, the more difficult determination, which involves the permanent severance of the parent-child relationship, focuses on whether consent is being withheld contrary to the best interests of the child.  To make that determination, where there is no showing that the non-consenting parent is unfit or by his conduct or previous legal action has lost his rights to the child, the party seeking adoption must produce clear and convincing evidence that a continuance of the parent-child relationship would be detrimental to the child's welfare.

Linkous, 10 Va. App. at 56-57, 390 S.E.2d at 194 (citations

omitted) (emphasis added).

Conversely, it follows that, where there is a showing of unfitness or conduct by the non-consenting parent causing him or her to lose his or her rights, the need to prove that a continuance of the parent-child relationship would be detrimental to the child is diminished, if not unnecessary.

In Linkous, after the divorce of the child's parents, the natural father was convicted of armed robbery and malicious wounding.[1] We stated that the natural father's "criminal conduct was and should have been an important and significant factor in the trial court's determination." Id. at 58, 390 S.E.2d at 195 (noting that natural father was "marginal parental figure" before incarceration). In upholding the trial judge's decision to allow the stepfather to adopt the minor child despite non-consent by the natural father, we explained:

> [The natural father's] repeated criminal conduct necessarily limited a reasonable expectation of visitation with his children during his incarceration regardless of the conduct of the [natural mother] in not supporting even limited visitation. While we do not decide whether prolonged incarceration resulting from convictions of serious felonies, rather than brief incarceration resulting from convictions of minor crimes . . . is sufficient in itself to support a finding that a continuance of the parent-child relationship would be detrimental to the children's welfare, the particular facts of this case, coupled with those convictions, warrant such a conclusion.

_____

[1]The crimes were not directed at the natural father's wife or children, and there was no evidence of any physical abuse against them.

14

Id.

In Malpass, despite reversing the trial court's grant of adoption, the Supreme Court acknowledged that it did "not intend to intimate that a child must be in a desperate situation before adoption may be ordered over the objection of a natural parent." 213 Va. at 399, 192 S.E.2d at 799 (also noting that it was unnecessary to show abandonment or unfitness before ordering such adoption).

Therefore, in addition to consideration of the factors set forth in Code § 63.1-225.1, we look to appellant's conduct and fitness. Appellant proved to be unfit when he murdered the natural mother and maliciously wounded the mother's husband and the children's stepfather. Appellant, who was not married to the natural mother, armed himself with and used different weapons against each victim; he stabbed the mother to death and shot her husband. In addition to demonstrating his unfitness, appellant, through his conduct, permanently deprived the children of the opportunity to receive the love, care and attention of their mother and foreclosed his ability, at least for a lengthy period of time, to perform any duties of a father or of forming any beneficial parental relationship during the children's formative years.

We are aware of no Virginia case in which a natural parent murdered the other natural parent and then succeeded in thwarting adoption by suitable parents. Faced with this issue, many other

jurisdictions have upheld adoptions by finding the surviving parent unfit or as having abandoned the children. See, e.g., R.F. v. S.S., 928 P.2d 1194, 1197 (Alaska 1996) (holding that "[l]eaving a child in limbo during his formative years based upon" speculation of the murdering father's future was against the child's best interests); Williams v. Townsend, 629 N.E.2d 252, 254 (Ind. Ct. App. 1994) (finding that father's murder of mother "condemned" child to "childhood spent without the daily care and nurturing of either of her natural parents"; holding that "commission of intentional act by a parent, which not only results in that parent's incarceration for the duration of the child's minority but which also deprives the child completely of the love, affection and care of the other parent, is sufficient to constitute abandonment of the child, negating the need for parental consent to adoption" under statute); In re M.F., 660 So.2d 952, 954 (La. Ct. App. 1995) (father's deliberate act of killing mother evidenced careless disregard for children's well-being and unfitness); In the interest of P.W.K., 815 S.W.2d 95, 96 (Mo. Ct. App. 1991) (mother's murder of father and subsequent incarceration was tantamount to abandonment); Adoption of Kurth, 557 P.2d 349 (Wash. Ct. App. 1976) (holding that consent by father who killed mother was not necessary to adoption).

Moreover, appellant was never married to the natural mother, and the record shows that appellant left the mother and children

whenever there were conflicts and stayed with his parents. The mother and her husband, the children's stepfather, were together at the time of the murder. Although appellant has been meeting with the children in prison for an hour or two every third week, the Urquharts have been the children's emotionally, financially and morally responsible parents. The record shows that the children "didn't really know [appellant] very well" before the murder and that they "developed a relationship over time visiting [appellant] in prison."

This evidence established that appellant had no fatherly relationship with the children prior to his incarceration. Although appellant's testimony regarding the quality of care he provided to the children before murdering their mother "was uncontradicted and unimpeached, the trier of fact did not have to accept this version of the facts simply because it was the only version supplied." Harrell, 11 Va. App. at 9, 396 S.E.2d at 684 (citation omitted). In addition, appellant's act of murder precluded the natural mother from rebutting appellant's self-serving version of his prior relationship with the children. To withhold consent because of appellant's occasional and brief visits with the children in prison would deny the children an opportunity to gain stability. The uncertainty surrounding appellant's release and the speculative possibility that he will assume a positive parental role further support the trial judge's decision. Finally, we note that appellant and his parents were

granted visitation privileges in the final order.[2]

In the final order, the trial judge explained that he considered all of the evidence as well as the statutory factors and standards in finding that appellant's consent was withheld "contrary to the best interests of the children."  Applying the statutory criteria and prior case law and reviewing all the facts of the case, including appellant's violent acts resulting in the de facto abandonment and orphaning of the children during their formative years, we find sufficient evidence supporting the trial judge's finding that appellant unreasonably withheld his consent for adoption.  By withholding his consent, appellant deprived the children of the stability and certainty that would result from being legally recognized children of the only people they have known as parents since the mother's murder.  Accordingly, we hold that the trial judge did not err in finding that appellant withheld his consent contrary to the children's best interests and that adoption would be in the children's best interests. Therefore, the decision of the trial judge is affirmed.

<u>Affirmed.</u>

---

[2]The parties did not contest the trial judge's order requiring visitation, and the record suggests that such visitation is beneficial.  In addition, the Urquharts agreed to the inclusion of visitation in the final order.  Accordingly, we do not address the propriety of such an order.