COURT OF APPEALS OF VIRGINIA

Present: Judges Petty, Chafin and Senior Judge Annunziata

CARLA BRIDGET TORRES-LARA

v.    Record No. 0109-14-1

ACCOMACK COUNTY DEPARTMENT
 OF SOCIAL SERVICES

MEMORANDUM OPINION[*]
PER CURIAM
DECEMBER 16, 2014

FROM THE CIRCUIT COURT OF ACCOMACK COUNTY
W. Revell Lewis, III, Judge

(Paul G. Watson, IV, on brief), for appellant. Appellant submitting
on brief.

(Carl H. Bundick; Marsha Dunning Carter, Guardian *ad litem* for
the minor child; Shore Advocacy Group, PLLC, on brief), for
appellee. Appellee and Guardian *ad litem* submitting on brief.

Carla Bridget Torres-Lara (hereinafter "mother") appeals the termination of her residual

parental rights to her son A.B. Mother asserts the trial court erred in terminating her parental

rights because she substantially remedied the conditions leading to the foster care placement and

the termination was not in the child's best interests. For the reasons stated, we affirm the trial

court's decision.

Background

When reviewing a decision to terminate parental rights, we presume the circuit court

"'thoroughly weighed all the evidence, considered the statutory requirements, and made its

determination based on the child's best interests.'" Toms v. Hanover Dep't of Soc. Servs., 46

---

[*] Pursuant to Code § 17.1-413, this opinion is not designated for publication.

Va. App. 257, 265-66, 616 S.E.2d 765, 769 (2005) (quoting Fields v. Dinwiddie Cnty. Dep't of Soc. Servs., 46 Va. App. 1, 7, 614 S.E.2d 656, 659 (2005)).

A.B. was removed from his mother's care on November 9, 2012, when he was nearly two months old. On that date, police responded to the home shared by mother and A.B.'s father, Jason Brumbaugh (hereinafter "father"), when mother reported father had assaulted her. By the time the police arrived, father had left. Mother smelled of alcohol, and her speech was slurred. A.B. was sleeping in a "pack and play" in the bedroom.

Social worker Abigail Allen arrived a short time later. She also noted mother smelled of alcohol. Mother's clothing was disheveled, and she had bruises on her face. The baby's diaper was so wet it had soaked through to his clothing. The temperature inside the home was cold. Upon Allen notifying mother she would be removing A.B., the mother became upset; however, she changed the baby's diaper and packed his clothes.

Ten days prior to A.B.'s removal, Allen had received a complaint that mother had dangled him over a fire pit.[1] After his removal, mother visited the child on a weekly basis in the visitation room near social worker Crystal Betz's office. Initially, Betz did not supervise the visits, as she could see the room from her office. In January 2013, however, mother confessed to her probation officer she had sexually abused her older son approximately ten years earlier during his infancy. Following that revelation, Betz supervised the visitation between A.B. and mother.

During the supervised visits, mother sometimes engaged in strange behavior. On one occasion in late May 2013, she refused to give A.B. a bottle of formula prepared by a social worker because she believed the formula contained drugs. She swore at social worker Kate

---

[1] At the termination hearing, Deputy Sheriff Eric Nottingham testified he overheard mother acknowledge during a phone call she had held the child over the fire because someone had taken her vodka bottle and she wanted it returned.

- 2 -

Bonniwell and told her "Babies do not drink cocaine." When Bonniwell attempted to take A.B. from her to feed him, mother pushed her away, causing Bonniwell to fear mother might drop the child. Bonniwell tossed the bottle and reassured mother she would not feed the bottle to the baby. Eventually, Bonniwell forcibly took A.B. from mother and walked out of the room. Mother yelled at Bonniwell that mother was "a surgeon general and that [Bonniwell] would be fired." After Bonniwell removed A.B., mother calmed down and explained she "had not been taking her medications."

Based on this confrontation, the Department of Social Services ("DSS") obtained a protective order, and mother's visitation was terminated.[2]

At the termination hearing, evidence was presented that mother abused alcohol and drugs and suffered from serious mental health problems. She acknowledged she "heard voices," but when she was taking her medication correctly, she did not hear them "as frequently." Mother asserted she was taking her medication properly at the time of the hearing, but admitted she had heard voices as recently as a month ago. She also confirmed she was sometimes in a "delusional state" in which she felt "that there [we]re other presences inside [her] body besides [her] own . . . ." She explained that "[t]he majority of the time [the presences] state[d] that they [were] federal officers or government officials."

Clinical psychologist Brian Wald testified regarding the results of mother's parenting evaluation. Dr. Wald opined that mother was unable to care for her child because she was "so delusional" and paranoid. He explained that individuals who suffered from delusions and paranoia and used drugs and alcohol were "the ones . . . most likely to experience violence."

---

[2] On another occasion, mother placed the young infant on a sofa during visitation. When he almost fell to the floor, the social worker suggested that she and A.B. play on the floor. After mother placed him on the floor, she left him there and did not interact with him. Upon mother starting to fall asleep, the social worker asked if she would like to end the visit early, and mother responded affirmatively.

Dr. Wald also viewed mother's visual hallucinations as significant because, among individuals suffering from hallucinations, only "a very small percentage" of them experienced visual hallucinations.

Dr. Wald described mother as "clearly . . . psychotic," with a reported long history of hallucinations, bipolar disorder, and numerous "run-ins with the law related to drug and alcohol use." He concluded the psychotic disorder she was experiencing was "long-standing" and that her prognosis for treatment was "very poor." In Dr. Wald's opinion, the evidence was "overwhelming that she [wa]s not able to parent this child."

In early October 2013, approximately two months prior to the termination hearing, mother tested positive for cocaine, marijuana, opiates, and amphetamines. Mother denied drinking alcohol or using drugs during the month prior to the hearing. Prior to that time, she acknowledged she was a "binge user." She also admitted using heroin in June 2013.

Other than A.B., mother had four children, none of whom lived with her. Mother conceded she was unable to care for A.B. at the time of the termination hearing because she was financially unstable and because she "needed to start working on [her] recovery [from] . . . drug addiction."

Analysis

Mother asserts in her assignment of error that the trial court erred in terminating her parental rights because she had substantially remedied the conditions leading to A.B.'s removal and because termination was not in A.B.'s best interests. Despite this assignment of error, mother concedes in her opening brief she "had not yet remedied the conditions that led to the removal [at the time her rights were terminated]." Her contention she had "substantially remedied" the conditions leading to removal rests on her counselor's testimony she had made

"substantial progress" in the treatment of her mental health during the year prior to the termination hearing.

While mother's counselor, Laura Lungarelli, testified that mother's dissociative disorder had improved over the past year, Lungarelli also acknowledged her condition required hospitalization four times during the prior year, one of which occurred within a month of the termination hearing. Lungarelli provided no timetable as to when she expected mother would recover from her condition. She characterized mother's dissociative disorder as "difficult" and admitted "it's something that you can't predict."

"'The trial court's judgment, "when based on evidence heard *ore tenus*, will not be disturbed on appeal unless plainly wrong or without evidence to support it."'" Id. at 266, 616 S.E.2d at 769 (quoting Fields, 46 Va. App. at 7, 614 S.E.2d at 659 (other citation omitted)). "In its capacity as factfinder, therefore, the circuit court retains 'broad discretion in making the decisions necessary to guard and to foster a child's best interests.'" Id. (quoting Farley v. Farley, 9 Va. App. 326, 328, 387 S.E.2d 794, 795 (1990)).

Pursuant to Code § 16.1-283(C)(2),

> [t]he residual parental rights of a parent or parents of a child placed in foster care . . . may be terminated if the court finds, based upon clear and convincing evidence, that it is in the best interests of the child and that:
>
>   *   *   *   *   *   *   *
>
> [t]he parent or parents, without good cause, have been unwilling or unable within a reasonable period of time not to exceed twelve months from the date the child was placed in foster care to remedy substantially the conditions which led to or required continuation of the child's foster care placement, notwithstanding the reasonable and appropriate efforts of social, medical, mental health or other rehabilitative agencies to such end. Proof that the parent or parents, without good cause, have failed or been unable to make substantial progress towards elimination of the conditions which led to or required continuation of the child's foster care placement in accordance with their obligations under and within the time

- 5 -

limits or goals set forth in a foster care plan filed with the court or any other plan jointly designed and agreed to by the parent or parents and a public or private social, medical, mental health or other rehabilitative agency shall constitute prima facie evidence of this condition. The court shall take into consideration the prior efforts of such agencies to rehabilitate the parent or parents prior to the placement of the child in foster care.

At the time mother's parental rights were terminated on January 9, 2014, A.B. had been removed from her custody for over a year. While mother sought treatment for her mental health issues, she acknowledged she was unable to care for A.B. at the time of the termination hearing. In addition to being unemployed, she continued to abuse alcohol and drugs up to a month prior to the hearing. Dr. Wald agreed with mother that she was incapable of parenting A.B., and he opined that her prognosis for her long-standing mental health issues was "very poor." Although mother's counselor was more optimistic, she could offer no time frame by which mother would recover. She also acknowledged mother's mental health issues had required multiple hospitalizations in the past year.

"It is clearly not in the best interests of a child to spend a lengthy period of time waiting to find out when, or even if, a parent will be capable of resuming his [or her] responsibilities." Kaywood v. Dep't of Soc. Servs., 10 Va. App. 535, 540, 394 S.E.2d 492, 495 (1990).

Virginia law recognizes the "maxim that, sometimes, the most reliable way to gauge a person's future actions is to examine those of his past." Petry v. Petry, 41 Va. App. 782, 793, 489 S.E.2d 458, 463 (2003). "As many courts have observed, one permissible 'measure of a parent's future potential is undoubtedly revealed in the parent's past behavior with the child." Id. (citation omitted). "No one can divine with any assurance the future course of human events. Nevertheless, past actions and relationships over a meaningful period serve as good indicators of what the future may be expected to hold." Winfield v. Urquhart, 25 Va. App. 688, 696-97, 492 S.E.2d 464, 467 (1997) (citations omitted).

Toms, 46 Va. App. at 267-68, 616 S.E.2d at 770.  Here, despite evidence mother loved A.B., she was unable to provide him with the stable home and care necessary to meet his needs.  She points to no evidence supporting her assertion that termination was not in A.B.'s best interests.

The decision of the trial court is supported by clear and convincing evidence, and accordingly, is affirmed.

Affirmed.