UNPUBLISHED

COURT OF APPEALS OF VIRGINIA

Present:    Judges Alston, Decker and Senior Judge Coleman
Argued by teleconference


JASON LAFIA

                                                        MEMORANDUM OPINION*
v.        Record No. 1149-14-3                                PER CURIAM
                                                          JANUARY 20, 2015
ROANOKE CITY DEPARTMENT
 OF SOCIAL SERVICES


                FROM THE CIRCUIT COURT OF THE CITY OF ROANOKE
                            Charles N. Dorsey, Judge

            L. Brad Braford for appellant.

            Heather P. Ferguson, Assistant City Attorney (Daniel J. Callaghan,
            City Attorney; Charles J. Covati, Guardian *ad litem* for the minor
            child, on brief) for appellee.


      Jason Lafia, father, appeals the trial court order terminating his parental rights to his

daughter, B.L-M.  On appeal, he argues the evidence was insufficient to terminate his parental rights

pursuant to Code § 16.1-283(E) and to establish the goal of adoption.[1]

      B.L-M. was born on September 18, 2013.  On that date, Meagan Waid, an investigator with

the Roanoke City Department of Social Services, (RCDSS), spoke with the child's mother at the

hospital and attempted to talk with father via telephone.  However, father refused to speak with

Waid.  Waid testified RCDSS had worked with father in the past concerning another child, H.L.

Father's parental rights to H.L. were involuntarily terminated in April of 2013.

---

      * Pursuant to Code § 17.1-413, this opinion is not designated for publication.

      [1] Although the parties initially waived oral argument, this was a case deserving of oral
argument.  Therefore, the Court invited the parties to present oral argument.

On September 20, 2013, Waid returned to the hospital and inquired if the parents had made alternative arrangements for caretakers for B.L-M. Waid testified father was angry, he did not want to speak with her, and he told her he did not have any family nearby. Father also told Waid the only person who helped the family was the payee who assisted with his social security payments. Waid further testified father was not responsive to her attempts to discuss possible services RCDSS could recommend to him. Waid also stated the hospital had attempted to teach father techniques to care for B.L-M. However, it did not appear father retained the information.

Courtney Jackson, a family services specialist with RCDSS, testified concerning the involvement of RCDSS with father regarding H.L. H.L. was born on August 22, 2011 and was placed in the legal custody of RCDSS on August 29, 2011. Jackson testified the original goal for H.L. was to return her to the family home. In order to achieve that goal, father was to maintain contact with RCDSS, complete a parental capacity assessment, complete reunification services, attend visitation, and maintain employment and stable housing. RCDSS offered father outpatient counseling, substance abuse counseling, reunification services, supervised visitation, a parental capacity assessment, and a domestic violence and abuse prevention assessment. Father completed the psychological evaluation, and he cooperated with the reunification services. He failed to complete outpatient counseling and substance abuse counseling. Additionally, he did not complete the domestic violence assessment. Father had supervised visitation with the child in the presence of an attachment specialist who assisted father with developing skills for caring for H.L. However, by April 2013, father had not progressed past the need for supervision during his visits and RCDSS had concerns for father's ability to care for H.L. Evidence was presented that father sustained a closed head injury in 2011.

Alexandria Bell, the foster care worker for B.L-M., testified father told her he did not want any services from RCDSS. While B.L-M. was in the custody of RCDSS, father attended supervised

visitation with her. Bell testified that during each visit someone had to intervene with father's care for the child. For example, father continuously failed to hold or feed B.L-M. appropriately, even after repeated intervention and instruction. Bell also stated father did not understand the developmental milestones of an infant. Bell testified father has poor retention and is unable to implement basic parenting skills despite his best efforts. In addition, B.L-M. suffers from numerous medical issues.

Father testified he refused services from RCDSS related to the care of B.L-M. because they suggested the same services he had previously been offered. He also asserted he had completed some of those services. Father testified he was now ready to cooperate by receiving services recommended by RCDSS, if given the opportunity. Father agreed that his 2011 head injury had an impact on his life and that he was no longer able to take care of his finances without assistance.

Father's counsel asked father if he had "any family anywhere that would be able to help" him with the care of B.L-M. Father responded, "I got someone in New York." Father's counsel asked, "Have you provided that information to the Department?" Father responded, "No." Father identified the family member as "Debbie," his aunt. Father did not know Debbie's last name and he stated that, although he spoke with Debbie "this week," he did not discuss with her the possibility of her assisting in the care of B.L-M. Father testified Debbie knew B.L-M. was in foster care.

The record contains a Foster Care Service Plan that states RCDSS asked both father and mother if any appropriate relatives could care for B.L-M. and they "were unable to name anyone." The plan further provides: "A relative search was done through Lexis-Nexis. Approximately seven letters were sent out to relatives of both [mother] and [father] that resulted in this search; however, to date, no one has contacted this agency regarding [B.L-M.]." The plan does not state the names of any of these relatives.

At the conclusion of the evidence, father argued that he had provided "at least a little bit of information about an aunt in New York," and he requested that the trial court continue the case and direct RCDSS to explore Debbie as a possible relative placement for B.L-M.

The guardian *ad litem* opined that father "simply cannot take care of this child" and that it was in the best interest of B.L-M. to terminate father's parental rights. The guardian *ad litem* also disagreed with the assertion that Debbie was "going to be appropriate," stating, "[s]he would have volunteered it by now. She knew what was going on."

The trial court found father had not failed to do anything that he had the ability to do. The trial court ruled the "requirements of law have been met," it terminated father's parental rights to B.L-M. pursuant to Code § 16.1-283(E), and it approved the goal of adoption for the child.

The law is very clear that:

> [w]hen addressing matters concerning the custody and care of a child, this Court's paramount consideration is the child's best interests. On appeal, we presume that the trial court thoroughly weighed all the evidence, considered the statutory requirements, and made its determination based on the child's best interests. The trial court is vested with broad discretion in making decisions "necessary to guard and to foster a child's best interests." We will not disturb a trial court's factual findings on appeal unless plainly wrong or without evidence to support them.

Brown v. Spotsylvania Dep't of Soc. Servs., 43 Va. App. 205, 211, 597 S.E.2d 214, 217 (2004) (citations omitted).

> Code § 16.1-283(A) provides, in pertinent part, that before terminating parental rights, "the court shall give a consideration to granting custody to relatives of the child, including grandparents." This Court has held that termination of parental rights is considered a grave proceeding and other remedies should be sought when available. Before termination of parental rights by the court, the agency seeking termination has an affirmative duty to investigate all reasonable options for placement with immediate relatives. Code § 16.1-283(A). The agency seeking termination has the burden to show that no reasonable alternatives exist; relatives who may be considered as alternatives have no duty to present themselves as such.

- 4 -

Sauer v. Franklin Cnty. Dep't of Soc. Servs., 18 Va. App. 769, 771, 446 S.E.2d 640, 641 (1994) (other citations omitted).

The duty to investigate is a rule of reason dependent upon the particular facts and circumstances of each individual case. "As long as evidence in the record supports the trial court's ruling and the trial court has not abused its discretion, its ruling must be affirmed on appeal." Brown v. Brown, 30 Va. App. 532, 538, 518 S.E.2d 336, 338 (1999).

While we recognize that it was the responsibility of RCDSS to investigate all reasonable potential relative placements and that "relatives who may be considered as alternatives have no duty to present themselves as such[,]" Sauer, 18 Va. App. at 771, 446 S.E.2d at 641, there is no evidence in the record that Debbie is suitable or willing to care for B.L-M., particularly in light of B.L-M.'s medical issues. In addition, the record does not indicate that prior to the termination hearing, father suggested to RCDSS that Debbie should be considered as a potential custodian. When B.L-M. was two days old, the RCDSS investigator asked father if he had "any family" and he responded that he did not have any family "nearby." Prior to that conversation, father refused to speak with the investigator on the telephone. Furthermore, father testified at the termination hearing that he had not provided RCDSS with information concerning Debbie. RCDSS was not required to investigate the home of every relative of a child, especially those whom father failed to suggest to RCDSS. See Hawthorne v. Smyth Cnty. Dep't of Soc. Servs., 33 Va. App. 130, 139, 531 S.E.2d 639, 644 (2000) ("It is well established in Virginia that a court will not compel 'a vain and useless undertaking.'" (quoting Virginia Passenger & Power Co. v. Fisher, 104 Va. 121, 129, 51 S.E. 198, 201 (1905))).

Moreover, despite the fact that father testified he had recently conversed with Debbie, he stated he did not discuss the possibility of her caring for B.L-M. In addition, he did not secure Debbie's presence at the termination hearing and she was aware that the child was in foster care.

Further, the Foster Care Service Plan stated that RCDSS inquired of both father and mother if any appropriate relatives could care for B.L-M. and they "were unable to name anyone." RCDSS conducted a relative search and sent approximately seven letters to relatives of both mother and father, but received no responses. The Foster Care Service Plan did not state the names of any of these relatives.

Thus, RCDSS investigated the existence of relatives of B.L-M. and made efforts to contact these relatives in order to determine a possible alternative placement for B.L-M. Evaluating and investigating alternative placement of a child with a relative is a very important part of the process when considering whether to terminate parental rights. On this record, and given that father failed to provide RCDSS with Debbie's name when asked, we cannot say the trial court erred in ruling the statutory requirements were met.

Father also contends the evidence was insufficient to terminate his parental rights to B.L-M. pursuant to Code § 16.1-283(E).

"[A] termination pursuant to Code § 16.1-283(E)(i) must be based upon clear and convincing evidence that the action is in the best interests of the child. See Code § 16.1-283(E). In addition, the trial court must find the parent's rights to a sibling of the child previously had been terminated. See Code § 16.1-283(E)(i)." Fields v. Dinwiddie Cnty. Dep't of Soc. Servs., 46 Va. App. 1, 8, 614 S.E.2d 656, 659 (2005) (footnote omitted).

Clear and convincing evidence proved that termination was in the best interests of B.L-M. Father sustained a closed head injury in 2011 and since that time he has been unable to take care of his finances without the assistance of a payee. He agreed the head injury has had an impact on his life. Evidence was presented that, despite instruction provided to father by an attachment specialist, father lacks the skills needed to meet the basic needs of B.L-M. Bell testified father has poor retention and is unable to implement basic parenting skills despite his best efforts. In the past, father

has refused to participate in services recommended by RCDSS, although at trial, he stated he was, at that time, willing to do so. Furthermore, B.L-M. has numerous serious medical issues that require ongoing medical care. Moreover, evidence was presented that father was also unable to care for B.L-M.'s older sibling, H.L., and his parental rights to that child were terminated in 2013.

> Virginia law recognizes the "maxim that, sometimes, the most reliable way to gauge a person's future actions is to examine those of his past." Petry v. Petry, 41 Va. App. 782, 793, 589 S.E.2d 458, 463 (2003). "As many courts have observed, one permissible 'measure of a parent's future potential is undoubtedly revealed in the parent's past behavior with the child.'" Id. "No one can divine with any assurance the future course of human events. Nevertheless, past actions and relationships over a meaningful period serve as good indicators of what the future may be expected to hold." Winfield v. Urquhart, 25 Va. App. 688, 696-97, 492 S.E.2d 464, 467 (1997).

Toms v. Hanover Dep't of Soc. Servs., 46 Va. App. 257, 267-68, 616 S.E.2d 765, 770 (2005).

At the time of the termination hearing, B.L-M. had been in foster care for seven months. Nothing in the record suggests that "the mere passage of time" would resolve father's parental difficulties. See Lecky v. Reed, 20 Va. App. 306, 312, 456 S.E.2d 538, 541 (1995). "Thus, further delay would prolong [B.L-M.]'s familial instability without the promise of benefit to h[er], a result clearly contrary to the child's best interests." Id. "It is clearly not in the best interests of a child to spend a lengthy period of time waiting to find out when, or even if, a parent will be capable of resuming his or [or her] responsibilities." Kaywood v. Halifax Cnty. Dep't of Soc. Servs., 10 Va. App. 535, 540, 394 S.E.2d 492, 495 (1990). It is important for a child to have permanence and stability in her life. Father has not demonstrated an ability to adequately care for and provide for B.L-M. Thus, clear and convincing evidence proved that termination of father's parental rights and establishing the foster care goal of adoption are in the best interests of the child.

Based on the evidence concerning the effort by RCDSS to locate suitable relatives willing and able to assume custody of B.L-M. and father's inability to care for B.L-M., we cannot say the

trial court erred in finding that RCDSS presented clear and convincing evidence satisfying the statutory requirements of Code § 16.1-283(E) and proving that it was in the best interests of the child to terminate father's parental rights. Accordingly, the decision of the trial court is affirmed.

Affirmed.