COURT OF APPEALS OF VIRGINIA

Present: Judges Humphreys, O'Brien and Senior Judge Bumgardner

CIARA MALAINE GRINDLE

MEMORANDUM OPINION[*]

v.      Record No. 1241-15-1                                    PER CURIAM
                                                                JANUARY 12, 2016

VIRGINIA BEACH
  DEPARTMENT OF HUMAN SERVICES

FROM THE CIRCUIT COURT OF THE CITY OF VIRGINIA BEACH
Steven C. Frucci, Judge

(Scott M. Lang; 7 Cities Law, on brief), for appellant.

(Mark D. Stiles, City Attorney; Christopher S. Boynton, Deputy City
Attorney; Elena E. Ilardi, Associate City Attorney; Kathleen A.
Keffer, Assistant CityAttorney; Sanita Swift Sherard, Guardian *ad
litem* for the minor child, on brief), for appellee.

Ciara Malaine Grindle ("mother") appeals the termination of her residual parental rights

to her child, K.P., pursuant to Code § 16.1-283(C)(2). She maintains the evidence was

insufficient to support the trial court's decision to terminate her rights because she substantially

remedied the conditions that led to K.P.'s foster care placement and because there was good

cause to excuse her failure to comply completely with the conditions for K.P.'s return. She also

asserts that various government agencies failed to make reasonable and appropriate efforts to

assist her in remedying the conditions that led to K.P.'s foster care placement. Finally, she

contends the procedures used to evaluate whether she had remedied the conditions leading to

K.P.'s removal deprived her of due process.

---

[*] Pursuant to Code § 17.1-413, this opinion is not designated for publication.

Upon reviewing the record and briefs of the parties, we conclude that this appeal is without merit. Accordingly, we summarily affirm the decision of the trial court. Rule 5A:27.

Background

When reviewing a decision to terminate parental rights, we presume the circuit court "thoroughly weighed all the evidence, considered the statutory requirements, and made its determination based on the child's best interests." Toms v. Hanover Dep't of Soc. Servs., 46 Va. App. 257, 265-66, 616 S.E.2d 765, 769 (2005) (quoting Fields v. Dinwiddie Cty. Dep't of Soc. Servs., 46 Va. App. 1, 7, 614 S.E.2d 656, 659 (2005)).

"'The trial court's judgment, "when based on evidence heard *ore tenus*, will not be disturbed on appeal unless plainly wrong or without evidence to support it."'" Id. at 266, 616 S.E.2d at 769 (quoting Fields, 46 Va. App. at 7, 614 S.E.2d at 659) (other citation omitted)). "In its capacity as factfinder, therefore, the circuit court retains 'broad discretion in making the decisions necessary to guard and to foster a child's best interests.'" Id. (quoting Farley v. Farley, 9 Va. App. 326, 328, 387 S.E.2d 794, 795 (1990)).

On February 25, 2012, the Virginia Beach Department of Human Services ("VBDHS") removed one-year-old K.P. from a babysitter after mother did not return at the appointed time and the babysitter was unable to reach her. Mother had a history of substance abuse and had begun to drink heavily and abuse prescription medications after K.P.'s birth. Although she had briefly enrolled in a detoxification program, she left after two weeks and moved in with a friend.

On Friday, February 24, 2012, the night before K.P. was removed, mother left K.P. with a babysitter, and stayed out all night drinking. Mother lost her cell phone, and did not return for K.P. on February 24, 2012, or on the following day. After K.P. was removed, Lisa Wall, a Child Protective Services ("CPS") investigator, was not able to get in touch with mother until February 26, 2012. Wall told mother that K.P. had been removed and informed her of the time and

location of the emergency removal hearing scheduled for Monday, February 27, 2012. Mother failed to appear.

Mother spoke with Wall prior to the preliminary removal hearing and advised that she would like VBDHS to investigate K.P.'s godmother, Terri Messer, as a potential placement. On March 5, 2012, mother attended the preliminary removal hearing with Messer, and the juvenile and domestic relations district court ("the JDR court") granted temporary custody to Messer. Wall informed mother she would have to be interviewed prior to visitation with K.P.

Over two weeks later, on March 22, 2012, mother called Wall about visitation. When Wall reminded mother about the required interview, mother stated she would call back the following day. Mother did not call, and when Wall tried to reach mother, her phone had been disconnected.

Nearly a month later, on April 17, 2012, mother left a voicemail with Wall. Because Wall knew that mother had a criminal hearing on April 18, 2012, Wall went to court so that she could speak with mother. Mother failed to appear for the hearing, and a capias was issued for her arrest. On April 23, 2012, mother called Wall about visitation. Wall reiterated that mother would have to meet with Wall, and mother made an appointment for a meeting. Wall waited for mother for three hours, and called mother multiple times, but mother failed to appear for the appointment.

While K.P. was in Messer's custody, mother continued to drink, was arrested and convicted of several criminal charges, and was incarcerated. Because she was on probation for an earlier conviction at the time of the 2012 convictions, her suspended sentence was revoked.

When mother was incarcerated, Messer decided she was not a viable placement for K.P., and K.P. was placed in foster care on May 3, 2012. Mother remained incarcerated, and a year later, on June 14, 2013, VBDHS petitioned the JDR court to terminate mother's parental rights.

After the petition was granted, mother appealed to circuit court. At the time of the hearing in circuit court on September 16, 2013, mother was still incarcerated, but predicted she would be released in November 2014.

At the conclusion of the hearing, the trial court continued the case to give mother an opportunity to be released from incarceration and to take advantage of the services offered in a halfway house and through her probation officer. The trial court noted that if mother did not comply by the time of the next hearing, her parental rights would be terminated.

A few months before mother's release from incarceration in early January 2015, Dr. Jennifer Gildea performed a psychological and parental evaluation. Dr. Gildea concluded that mother suffered from a mood disorder and was possibly bi-polar. She also noted that mother had a history of alcohol dependence, as well as drug abuse. Dr. Gildea stated that mother needed further psychiatric evaluation and monitoring, substance abuse intervention and support, and continued parenting education upon her release from incarceration.

In Dr. Gildea's opinion, even if mother were able to meet all of her service plan goals, the effort required to establish and maintain a relationship with K.P. would be "too disruptive and stressful" for the child, who, at that time, was three years old. Dr. Gildea noted that K.P. had lived with her foster parents for an extended period of time and had bonded with them. To establish a parenting relationship with K.P., mother would require "intensive, long-term . . . services and support." Dr. Gildea concluded that mother needed "long-term attachment based therapy, parental coaching, and increasing contact with her child in order to attempt to establish a parent-child attachment." Even with that support, Dr. Gildea believed that establishing a relationship with mother would be potentially detrimental to the child's ability to form secure attachments in the future. Dr. Gildea recommended against the goal of reunification between mother and K.P. in the interests of the child's well-being.

Assuming that reunification were to occur, however, Dr. Gildea stated that mother would

> need to establish that her mood is stable, that she is compliant with her own treatment regimen, that she has been abstinent from substances while living in the community for at least nine months, that she has established secure and stable housing, and that she is not engaging in unhealthy relationship dynamics.

When mother appeared before the trial court on January 22, 2015, the trial court again agreed to continue the case because mother had been released from incarceration for only a couple of weeks. Shortly after the January hearing, social worker Rhonda Hoffman spoke with mother by phone and advised her that she needed to have a mental health evaluation and to enroll in a substance abuse program. Hoffman referred mother to the Chesapeake Community Services Board for services because mother was living in Chesapeake following her release.

Hoffman spoke with mother several times from late January through early February. During that time, Hoffman repeatedly advised mother that mental health and substance abuse evaluations needed to take priority over her other goals; however, mother indicated she could not attend the substance abuse programs because they interfered with her job. On February 10, 2015, mother questioned why she needed to attend a program when she had already completed a program while she was incarcerated. Hoffman explained that the program was necessary because she was no longer in a controlled environment and Dr. Gildea believed she was at risk for relapse.

Hoffman scheduled a meeting for mother for early March, but mother missed the appointment. Mother called Hoffman and explained she was unable to attend the meeting because she had received a promotion at work. Mother asked Hoffman to call her. Hoffman called mother back on March 16, 17, 20, 2015. On each occasion, Hoffman left a voicemail, but mother did not return the calls. Finally, on March 31, 2015, Hoffman wrote mother and explained that mother needed to meet with Hoffman to sign releases so that Hoffman could

speak with mother's probation officer and service providers. Hoffman also noted she had funding to perform a hair follicle drug test, and asked that mother provide her with a status on her therapy. Hoffman notified mother she was scheduling the meeting for April 3, 2015.

On April 9, 2015, mother called Hoffman and told her she had just received the letter. Mother stated she had obtained health insurance through her job and she was planning to start a substance abuse program. On April 14, 2015, mother completed the hair follicle test. The test results were "clean." However, when Hoffman spoke with mother again on May 13, 2015, mother stated she was not able to undertake the substance abuse program because she had changed jobs and no longer had insurance.

By the time mother appeared in court again on May 18, 2015, she had not completed the psychiatric evaluation or an intensive substance abuse program. Instead, she had only attended the weekly support group meetings arranged by her probation officer.

Mother testified that she called the Community Services Board after she met with her probation officer upon her release and that the Board told her probation officer mother could "come and do an intake." Mother stated the Board informed her that, because she was obtaining private insurance through her employment, the services were unavailable. She stated that she was in the process of trying to regain her driver's license but could only do after she had paid a percentage of her fines. She acknowledged that she faced between fifteen and twenty years of further incarceration if she violated her probation.

At the time of the May hearing, K.P. was over four years old and had no relationship with mother. She had been with her foster parents since she was fifteen months old. She thrived under their care and bonded with them, referring to them as "Mommy" and "Daddy." To K.P.'s understanding, her foster parents were her only parents, and their other children were her siblings.

At the conclusion of the hearing, the trial court found that mother had failed to have an evaluation for her mental health issues or to enroll in a treatment program for substance abuse. While the trial court acknowledged that mother was attending weekly support meetings, it noted that she had failed to seek the counseling required by VBDHS. The trial court found further that mother's failure to seek treatment was not based upon a lack of financial resources, but rather, on the basis that mother did not feel the treatment was necessary. Because mother was not "on the track" to achieve stability with her mental health and substance abuse issues within nine months of her release from incarceration, the trial court concluded termination was in K.P.'s best interests.

This appeal followed.

<u>Analysis</u>

I. and II.

Mother asserts that the trial court erred by terminating her parental rights because she substantially remedied the conditions that led to K.P.'s removal and because she had "good cause" for failure to remedy the conditions completely. She also asserts that the trial court erred by terminating her parental rights because reasonable and appropriate efforts were not made to provide her with the services she required to remedy those conditions.

We disagree. Pursuant to Code § 16.1-283(C)(2),

> [t]he residual parental rights of a parent or parents of a child placed in foster care . . . may be terminated if the court finds, based upon clear and convincing evidence, that it is in the best interests of the child and that:
>
> . . . .
>
> [t]he parent or parents, without good cause, have been unwilling or unable within a reasonable period of time not to exceed twelve months from the date the child was placed in foster care to remedy substantially the conditions which led to or required continuation of the child's foster care placement,

- 7 -

notwithstanding the reasonable and appropriate efforts of social, medical, mental health or other rehabilitative agencies to such end. Proof that the parent or parents, without good cause, have failed or been unable to make substantial progress towards elimination of the conditions which led to or required continuation of the child's foster care placement in accordance with their obligations under and within the time limits or goals set forth in a foster care plan filed with the court or any other plan jointly designed and agreed to by the parent or parents and a public or private social, medical, mental health or other rehabilitative agency shall constitute prima facie evidence of this condition. The court shall take into consideration the prior efforts of such agencies to rehabilitate the parent or parents prior to the placement of the child in foster care.

Here, mother had multiple opportunities to prove her ability to remedy the conditions leading to K.P.'s foster care placement, and failed to do so. Her initial response to K.P.'s placement was to continue drinking and to commit new criminal offenses. Only after she was incarcerated and in a controlled environment did she discontinue her abuse of drugs and alcohol. Despite VBDHS providing her with psychiatric services during her incarceration, she failed to stabilize her health through intensive mental health and substance abuse counseling upon her release.

Finally, while the trial court did not base its termination decision on mother's extended incarceration, it was entitled to consider her incarceration, as well as the potential for future incarceration, in reaching the conclusion that termination was in K.P.'s best interest.

> While long-term incarceration does not, *per se*, authorize termination of parental rights . . . it is a valid and proper circumstance which, when combined with other evidence concerning the parent/child relationship, can support a court's finding by clear and convincing evidence that the best interests of the children will be served by termination.

Ferguson v. Stafford Cty. Dep't of Soc. Servs.,14 Va. App. 333, 340, 417 S.E.2d 1, 5 (1992).

"It is clearly not in the best interests of a child to spend a lengthy period of time waiting to find out when, or even if, a parent will be capable of resuming his [or her] responsibilities."

Kaywood v. Halifax Cty. Dep't of Soc. Servs., 10 Va. App. 535, 540, 394 S.E.2d 492, 495 (1990).

> Virginia law recognizes the "maxim that, sometimes, the most reliable way to guage a person's future actions is to examine those of his past." Petry v. Petry, 41 Va. App. 782, 793, 489 S.E.2d 458, 463 (2003). "As many courts have observed, one permissible 'measure of a parent's future potential is undoubtedly revealed in the parent's past behavior with the child.'" Id. (citation omitted). "No one can divine with any assurance the future course of human events. Nevertheless, past actions and relationships over a meaningful period serve as good indicators of what the future may be expected to hold." Winfield v. Urquhart, 25 Va. App. 688, 696-97, 492 S.E.2d 464, 467 (1997) (citations omitted).

Toms, 46 Va. App. at 267-68, 616 S.E.2d at 770.

Here, in addition to a long history of substance abuse and mental health issues, mother had been unable to care for her older two children, and, despite several continuances, acknowledged she was not yet ready to assume custody of K.P. at the time of the termination hearing. While mother had taken steps toward achieving sobriety during the three years since K.P.'s removal, she had refused to recognize the need for intensive substance abuse therapy or to address her mental health issues. Without such support, the trial court found that mother was unable to provide K.P. with the stable environment necessary for her well-being.

By the time of the termination hearing, K.P. was four years old and had bonded with her foster parents. She referred to her foster parents as her mother and father, and had no relationship with her mother. K.P. was thriving in the foster parents' care, and the foster parents expressed their desire to adopt her.

Accordingly, clear and convincing evidence proved that mother had, without good cause, failed to make substantial progress towards elimination of the conditions which led to K.P.'s foster care placement and that termination of mother's parental rights was in K.P.'s best interests.

The evidence also supported the trial court's conclusion that mother's failure to remedy the conditions leading to K.P.'s removal did not result from the failure of the VBDHS or other agencies to provide services to mother. Hoffman repeatedly directed mother toward the services necessary for mother to obtain mental health and substance abuse counseling, but mother failed to cooperate with those efforts. Instead, mother either questioned the necessity for such services or stated that she was seeking them independently through her private insurance carrier.

Thus, clear and convincing evidence proved that mother failed to remedy substantially, without good cause, the conditions leading to K.P.'s removal, "notwithstanding the reasonable and appropriate efforts of social, medical, mental health or other rehabilitative agencies to such end."

### III.

Finally, mother contends that she was deprived of due process because the conditions imposed upon her to reunite with K.P. "could not have possibly been met in their entirety." She maintains she was not given a "fair opportunity to establish her case and [to] show that she [could] meet the conditions imposed."

Appellant asserts the deprivation of her due process rights for the first time on appeal. Because she did not present this argument to the trial court, she has failed to preserve it.

"No ruling of the trial court . . . will be considered as a basis for reversal unless an objection was stated with reasonable certainty at the time of the ruling, except for good cause shown or to enable the Court of Appeals to attain the ends of justice." Rule 5A:18.

> Under this rule, a specific argument must be made to the trial court at the appropriate time, or the allegation of error will not be considered on appeal. A general argument or an abstract reference to the law is not sufficient to preserve an issue. Making one specific argument on an issue does not preserve a separate legal point on the same issue for review.

Edwards v. Commonwealth, 41 Va. App. 752, 760, 589 S.E.2d 444, 448 (2003) (*en banc*).

"This rule applies to issues involving constitutional principles." West v. Commonwealth, 43 Va. App. 327, 336, 597 S.E.2d 274, 278 (2004).

> Although Rule 5A:18 allows exceptions for good cause or to meet the ends of justice, appellant does not argue that we should invoke these exceptions. See e.g., Redman v. Commonwealth, 25 Va. App. 215, 221, 487 S.E.2d 269, 272 (1997) ("In order to avail oneself of the exception, a *defendant must affirmatively show* that a miscarriage of justice has occurred, not that a miscarriage might have occurred." (emphasis added)). We will not consider, *sua sponte*, a "miscarriage of justice" argument under Rule 5A:18.

Edwards, 41 Va. App. at 761, 589 S.E.2d at 448.

Accordingly, the trial court's decision is summarily affirmed. See Rule 5A:27.

Affirmed.