UNPUBLISHED

COURT OF APPEALS OF VIRGINIA


Present: Judges Humphreys, McCullough and Senior Judge Bumgardner


KIVA WILLIAMS-KEMP

MEMORANDUM OPINION[*]
v.      Record No. 1979-14-2      PER CURIAM
FEBRUARY 10, 2015

PRINCE EDWARD COUNTY
   DEPARTMENT OF SOCIAL SERVICES


FROM THE CIRCUIT COURT OF PRINCE EDWARD COUNTY
Kimberly S. White, Judge

(Kemper M. Beasley, III, on brief), for appellant.

(Jody Holyst Fariss; Eric A. Tinnell, Guardian *ad litem* for the infant
child, on brief), for appellee.


Kiva Williams-Kemp ("father") appeals the termination of his residual parental rights to

his son, G.K. Father asserts the trial court erred in finding G.K. was subject to abuse and/or

neglect and in finding the evidence sufficient to terminate father's parental rights. Upon

reviewing the record and briefs of the parties, we conclude that this appeal is without merit.

Accordingly, we summarily affirm the decision of the trial court. See Rule 5A:27.

We view the evidence in the light most favorable to the prevailing party below and grant

to it all reasonable inferences fairly deducible therefrom. See Logan v. Fairfax Cnty. Dep't of

Human Dev., 13 Va. App. 123, 128, 409 S.E.2d 460, 463 (1991). G.K. was born on March 31,

2014. He was premature and had a low birth weight, only one functioning kidney, and a low

glucose level. His condition placed him at high risk of failure to thrive. On April 2, 2014, the

Prince Edward County Department of Social Services ("PEDSS") received a complaint from the

---

[*] Pursuant to Code § 17.1-413, this opinion is not designated for publication.

hospital that G.K.'s mother was not feeding him properly. As a result of the complaint, PEDSS investigated the family's home. At that time, G.K.'s parents were living in a single room at the Town Motel.

Prior to G.K.'s birth, PEDSS had a long history with his parents dating back to 2007. In 2007 PEDSS offered the parents services in connection with the couple's first child, D.K. The issues surrounding D.K.'s care pertained to the cleanliness of the home, safety hazards, and hygiene.

Approximately eight months later, in June 2008, PEDSS removed both D.K. and his younger sibling after responding to a complaint of domestic violence. Father and mother were living in a room with the children at the Town Motel. The room was filled with trash, and beer and liquor bottles were scattered throughout the floor. D.K. and his young sibling, E.K., were left in soiled, soaked diapers. The playpen was filled with dirty clothes, and E.K. was strapped into a car seat perched on a dresser. She was wheezing and coughing, and had dried vomit on her mouth, neck, and chest. D.K.'s entire body was covered with a rash.

Following a finding of abuse and neglect against both parents, PEDSS worked extensively with the family and provided abundant services. These services included mental health services, medication management, individual and marital counseling, substance abuse evaluation and treatment, and parenting education, including an in-house aide. Father was incarcerated during some of the time the children were in foster care, but upon his release, PEDSS worked with him on his substance abuse issues.

The children were returned home two years later in June 2010. By that time, the family had moved to Cumberland County. Approximately one month later, motorists found E.K. in the middle of the road outside the family residence. Her sibling, D.K., was standing on the edge of

the road with a knife in his hand. Mother and father were intoxicated or incapacitated inside the home.

This incident resulted in the removal of the children and another finding of abuse and neglect against the parents. Cumberland County social services provided extensive services to the parents and returned the children in July 2011. Within five months, however, another complaint was filed after the children were discovered sleeping in trash and filth, and exposed to constant fighting and drinking. A week after the complaint, a case worker found the children unattended and removed them from the home yet again. Yet again, a finding of abuse and neglect was made against the parents.

When the children were ultimately returned in February 2013, a protective order was entered requiring father to provide constant supervision to the children. Due to mother's mental health issues, the children were not to be left alone in her care.

By the time the children returned, their parents had moved from Cumberland back to Prince Edward. Within a week, PEDSS again removed the children after discovering father under the influence of alcohol and marijuana while E.K. and her sister, F.K., were left in his care. Father was also arrested for assault and battery against the mother.

Ultimately, the parents voluntarily agreed to the termination of their parental rights with respect to E.K., F.K., and D.K. The order terminating their rights was entered shortly prior to G.K.'s birth.

When PEDSS received the complaint from the hospital after G.K.'s birth, it investigated the home and found father living once again in squalor at the Town Motel. Trash and spoiled food were scattered throughout the room, and dirty dishes were piled a foot high in the sink. The playpen and baby swing, both of which were dirty and damp, were outside the room. The car

- 3 -

seat was inside, but was covered in clutter and filth. The room contained no appropriate place for G.K. to sleep.

Father acknowledged the condition of the motel room was not suitable for G.K., but stated the child had been born prematurely and that he had planned to move on April 1, 2014. He maintained he planned to move to a boarding house in Lynchburg, but could provide no details about its location or contact information. Several hours later, father told the case worker he intended to move to his cousin's home in Lynchburg; however, he was unable to provide an address, telephone number, or his cousin's last name. Within two weeks, father stated he planned to move to yet another location.

Father never moved from the Town Motel, however. Instead, he remained there until July 7, 2014, when he was arrested for marijuana distribution and conspiracy to distribute marijuana. He was still incarcerated and awaiting trial at the time of the termination hearing.

Prior to his arrest, father visited G.K. every other week for approximately one hour. Social worker Kimberly Allen noted father was usually "disengaged" during the visits, however, and that most of the interaction occurred between the mother and child.

### A. Abuse and Neglect

Father asserts the trial court erred in concluding abuse and neglect had occurred based on his history of not having provided his children with appropriate housing, his current lack of appropriate housing for G.K., and his lack of a plan for appropriate housing. He contends he had a plan in place to move to a proper residence and had stored the items necessary to care for his child. He maintains removal was not warranted, as he had not yet moved the child to the Town Motel and the child was not in imminent danger.

"[T]he statutory definitions of an abused or neglected child do not require proof of actual harm or impairment having been experienced by the child." Jenkins v. Winchester Dep't of

- 4 -

Family Servs., 12 Va. App. 1178, 1183, 409 S.E.2d 16, 19 (1991). See Code § 16.1-228. Here, despite repeated efforts by PEDSS and other agencies, father had a long history of neglect and abuse with his older children, ultimately resulting in his surrendering his rights to the children. Presented with a premature infant requiring special care, father did not secure appropriate housing to address the baby's needs; instead, he committed criminal offenses that led to his incarceration.

In Jenkins we concluded that "the statutory definitions of an abused or neglected child do not require proof of actual harm or impairment having been experienced by the child. The term 'substantial risk' [in Code § 16.1-228] speaks *in futuro* . . . ." Jenkins, 12 Va. App. at 1183, 409 S.E.2d at 19. In that case, "[n]o evidence in the record suggest[ed] a realistic probability of improvement or alleviation of the conditions which led to the removal initially." Id. Thus, we held that

> the Code contemplates intervention in such circumstances by allowing for the emergency removal of children before placement into an environment where "the child would be subjected to an imminent threat to life or health to the extent that severe or irreversible injury would be likely to result if the child were returned to or left in the custody of his parent. . . ." Code § 16.1-251(A)(1).

Id.

Likewise, in this case, extensive evidence supported the trial court's finding that father was unable to render appropriate care. Father himself admitted that the living conditions at the motel were not adequate to meet G.K.'s needs and, even after the child's removal, he took no steps to secure an appropriate housing alternative.

Accordingly, the trial court did not err in finding that G.K. was abused or neglected.

B. Termination of Parental Rights

When reviewing a decision to terminate parental rights, we presume the circuit court "'thoroughly weighed all the evidence, considered the statutory requirements, and made its determination based on the child's best interests.'" Toms v. Hanover Dep't of Soc. Servs., 46 Va. App. 257, 265-66, 616 S.E.2d 765, 769 (2005) (quoting Fields v. Dinwiddie Cnty. Dep't of Soc. Servs., 46 Va. App. 1, 7, 614 S.E.2d 656, 659 (2005)). "The trial court's judgment, 'when based on evidence heard *ore tenus*, will not be disturbed on appeal unless plainly wrong or without evidence to support it.'" Id. at 266, 616 S.E.2d at 769 (quoting Logan, 13 Va. App. at 128, 409 S.E.2d at 463).

Father contends the evidence was insufficient to support the trial court's decision to terminate his parental rights pursuant to Code § 16.1-283.[1] Noting that PEDSS relied on subsection (B) at the termination hearing, he asserts that he was "not allowed the opportunity to correct his housing situation" so that G.K. could be returned to him. He maintains he was not given enough time to demonstrate his ability to care for the child and contends he was "in the process of" collecting the funds to move to a new residence when the juvenile and domestic relations district court terminated his rights.

Under Code § 16.1-283(B), the residual parental rights to a child found to be abused and neglected and placed in foster care may be terminated if the court finds, based upon clear and convincing evidence, that it is in the best interests of the child and that:

> (1) The neglect or abuse suffered by such child presented a serious and substantial threat to his life, health or development, and

---

[1] The trial court ruled from the bench that the evidence was sufficient to warrant termination pursuant to Code § 16.1-283(B)(1) and (2), but the final order also cites Code § 16.1-283(C)(2). Because we conclude that the evidence supported the trial court's termination decision under subsection (B), we need not address whether the evidence also warranted termination under subsection (C).

- 6 -

(2) It is not reasonably likely that the conditions which resulted in such neglect or abuse can be substantially corrected or eliminated so as to allow the child's safe return to his parent or parents within a reasonable period of time. In making this determination, the court shall take into consideration the efforts made to rehabilitate the parent or parents by any public or private social, medical, mental health or other rehabilitative agencies prior to the child's initial placement in foster care

"It is clearly not in the best interests of a child to spend a lengthy period of time waiting to find out when, or even if, a parent will be capable of resuming his [or her] responsibilities."

Kaywood v. Dep't of Soc. Servs., 10 Va. App. 535, 540, 394 S.E.2d 492, 495 (1990).

Virginia law recognizes the "maxim that, sometimes, the most reliable way to gauge a person's future actions is to examine those of his past." Petry v. Petry, 41 Va. App. 782, 793, 489 S.E.2d 458, 463 (2003). "As many courts have observed, one permissible 'measure of a parent's future potential is undoubtedly revealed in the parent's past behavior with the child." Id. (citation omitted). "No one can divine with any assurance the future course of human events. Nevertheless, past actions and relationships over a meaningful period serve as good indicators of what the future may be expected to hold." Winfield v. Urquhart, 25 Va. App. 688, 696-97, 492 S.E.2d 464, 467 (1997) (citations omitted).

Toms, 46 Va. App. at 267-68, 616 S.E.2d at 770.

Here, the trial court's decision is supported by extensive credible evidence. Despite a panoply of services provided to father over several years,[2] he continued to abuse or neglect his children, to lapse into substance abuse and, on occasion, to engage in violence or other criminal activities. While father informed PEDSS he had plans to provide suitable housing in the future, he never took any steps toward making those plans a reality. Instead, within months of G.K.'s removal, he was incarcerated. Given his history, the trial court was entitled to conclude that it was not reasonably likely that father could substantially remedy or correct the neglect or abuse

---

[2] In reaching its decision, the trial judge noted that she was unfamiliar with any other case in which so many services had been provided to a family.

leading to G.K.'s removal within a reasonable period of time and that termination of father's parental rights was in G.K.'s best interests.

Accordingly, the trial court's decision is summarily affirmed.  <u>See</u> Rule 5A:27.

<u>Affirmed.</u>