UNPUBLISHED

COURT OF APPEALS OF VIRGINIA


Present: Judges Beales, Russell and Senior Judge Frank


RONALD REDMAN, JR.

                                    MEMORANDUM OPINION[*]

v.      Record No. 1900-15-3                        PER CURIAM
                                              JUNE 7, 2016

ROANOKE CITY DEPARTMENT
 OF SOCIAL SERVICES


FROM THE CIRCUIT COURT OF THE CITY OF ROANOKE
Charles N. Dorsey, Judge

(Brittany C. Furr; Steidle Law Firm, on brief), for appellant.

(Daniel J. Callaghan, City Attorney; Heather P. Ferguson, Assistant
City Attorney; Joseph F. Vannoy, Guardian *ad litem* for the minor
child, on brief), for appellee.


      Ronald Redman, Jr. ("father") appeals the termination of his residual parental rights to his

child, A.R., pursuant to Code § 16.1-283(C)(2) and 16.1-283(B). He maintains the evidence was

insufficient to support the trial court's decision to terminate his rights and to approve the

permanency planning goal of adoption. Upon reviewing the record and briefs of the parties, we

summarily affirm the trial court's decision, pursuant to Rule 5A:27.

Background

      When reviewing a decision to terminate parental rights, we presume the circuit court

"thoroughly weighed all the evidence, considered the statutory requirements, and made its

determination based on the child's best interests." Toms v. Hanover Dep't of Soc. Servs., 46

Va. App. 257, 265-66, 616 S.E.2d 765, 769 (2005) (quoting Fields v. Dinwiddie Cty. Dep't of

Soc. Servs., 46 Va. App. 1, 7, 614 S.E.2d 656, 659 (2005)).

---

          [*] Pursuant to Code § 17.1-413, this opinion is not designated for publication.

"The trial court's judgment, 'when based on evidence heard *ore tenus*, will not be disturbed on appeal unless plainly wrong or without evidence to support it.'" Id. at 266, 616 S.E.2d at 769 (quoting Fields, 46 Va. App. at 7, 614 S.E.2d at 659). "In its capacity as factfinder, therefore, the circuit court retains 'broad discretion in making the decisions necessary to guard and to foster a child's best interests.'" Id. (quoting Farley v. Farley, 9 Va. App. 326, 328, 387 S.E.2d 794, 795 (1990)).

On April 25, 2014, the Roanoke Department of Social Services ("RDSS") received a complaint that father was physically neglecting his two-year-old daughter, A.R. The complaint alleged that father was using and selling drugs in the home and that A.R. "was walking around with her diaper all the time and did not have her own bedroom." On May 1, 2014, social worker Amanda Whorley visited father's home at approximately 10:30 a.m. Both father and A.R. appeared to have been sleeping.

Whorley noticed there was "barely any food" in the house and that the refrigerator was empty. Father prepared a bottle of whole milk for A.R. while he spoke with Whorley. He explained he intended to go to the grocery store later that day. Upon inspecting the home, Whorley noted that two mattresses were on the living room floor. A.R. slept on one mattress with her father, and her paternal grandfather slept on the other mattress.

Mother was not in the home because she was incarcerated. After observing a razor blade with a white, powdery substance on the edges, Whorley asked father if he would be able to pass a drug test. He answered affirmatively. Whorley left the home, but advised father she would be back in touch.

The following day, on May 2, 2014, Officer Sloan called Whorley and told her a search warrant had been executed at father's home the prior day. The police found needles and heroin within A.R.'s reach. When the police arrived, father had a needle filled with heroin ready for use.

During the search, two buyers arrived to purchase heroin. Officer Sloan allowed father to place A.R. with friends "Brandon and Dannielle" for the night.

When Whorley returned to father's apartment the afternoon of May 2, 2014, she encountered Danielle Capizunski in a car outside the home. Capizunski told Whorley that father was "out looking for work" and that A.R. was near a wooded area beside the home. Whorley asked Capizunski to bring A.R. to her so that Whorley could confirm the child was safe. She also called father and asked him to come home, but he refused to do so. A third party arrived at the scene and removed A.R.

Whorley obtained an emergency protective order requiring father to make A.R. available to RDSS. She served it on father on May 7, 2014. RDSS also removed A.R. from the home. Whorley explained to father that A.R. was being removed because of the drugs in the home. Father told Whorley that A.R. knew "not to touch them."

On June 25, 2014, RDSS filed its initial foster care plan with a goal of returning A.R. to her home. Several goals were established for father, including substance abuse assessment and psychological and parenting capacity evaluations. The target date for father's completion of these goals was October 2014. Father was also instructed to obtain appropriate housing and employment by March 2015.

By November 2014 father had not completed the psychological evaluation. Foster care worker Melissa Viet called father in December 2014 and asked him to schedule the evaluation. After a family partnership meeting with father in January 2015, he underwent the evaluation[1] in February 2015. He did not, however, obtain suitable housing or employment.

---

[1] The psychologist who evaluated father concluded he had "significant limitations" in his parenting ability, suffered from "chronic, low-grade depression," and acknowledged he had "priort[ized] . . . money and drugs over the welfare of his daughter."

RDSS attempted a trial home placement with A.R.'s mother in October 2014, on the condition that father avoid contact with A.R. unless mother was present. In November 2014, however, Viet visited the home after receiving a report the home was dirty and without food. Upon speaking with father, Viet found his speech was so slow and slurred that she had difficulty understanding him. The refrigerator was broken, and there was little food in the house. Mother and father were using space heaters because they stated they had no money to fill the oil tank. Two individuals in the home reported that mother and father were using drugs.

Viet asked father to undergo a drug screen the following day, but he refused to do so. When he eventually agreed to a hair follicle test, he tested positive for morphine and heroin use in the past ninety days. In December 2014, A.R. was returned to her foster home.

Weekly visitations were scheduled for father, but he missed five visits between December 2014 and April 2015, as well as all in May 2015. Most of the visits were missed without prior explanation. When father did visit, he made statements such as, "You don't like them. We're going to kick them and punch them in the face." He referred to Viet as a "bitch" and told Viet he "hoped something would happen" to her children. His statements in A.R.'s presence became so hostile during a visit in March 2015 that Viet's supervisor became involved, and father was asked to leave.

Father failed drug screens on six occasions between January 2015 and April 16, 2015.

In May 2015 father was arrested on charges of heroin distribution, and was incarcerated. At that time, he was on probation for cocaine distribution convictions. Following conviction on the new offenses, as well as his convictions for violating his probation, he received an active term of six years.

At the time of the termination hearing on November 4, 2015, A.R. was three years old, and living with her twelve-year-old half-sister in the same foster home. Viet stated that A.R. was "doing great" in the foster home, loved her older sister, and wanted to be with her "permanently." Viet

- 4 -

noted that mother's parental rights to A.R.'s half-sister had been terminated and that the half-sister was available for adoption.

Analysis

I. and II.

Father asserts that the trial court erred by terminating his parental rights because he substantially remedied the conditions that led to A.R.'s removal. He also asserts that the trial court erred by terminating his parental rights because reasonable and appropriate efforts were not made to provide him with the services he required to remedy those conditions.

We disagree. Pursuant to Code § 16.1-283(C)(2),

> [t]he residual parental rights of a parent or parents of a child placed in foster care . . . may be terminated if the court finds, based upon clear and convincing evidence, that it is in the best interests of the child and that:
>
> . . . .
>
> [t]he parent or parents, without good cause, have been unwilling or unable within a reasonable period of time not to exceed twelve months from the date the child was placed in foster care to remedy substantially the conditions which led to or required continuation of the child's foster care placement, notwithstanding the reasonable and appropriate efforts of social, medical, mental health or other rehabilitative agencies to such end. Proof that the parent or parents, without good cause, have failed or been unable to make substantial progress towards elimination of the conditions which led to or required continuation of the child's foster care placement in accordance with their obligations under and within the time limits or goals set forth in a foster care plan filed with the court or any other plan jointly designed and agreed to by the parent or parents and a public or private social, medical, mental health or other rehabilitative agency shall constitute prima facie evidence of this condition. The court shall take into consideration the prior efforts of such agencies to rehabilitate the parent or parents prior to the placement of the child in foster care.

Here, father had multiple opportunities to prove his ability to remedy the conditions leading to A.R.'s foster care placement, and he failed to do so. Following A.R.'s removal, he

- 5 -

continued to abuse drugs. He completed the psychological evaluation only at Viet's insistence, and did not secure stable housing and employment. Not only did he fail multiple drug screens, he continued to distribute drugs. Finally, he failed to appear for several visitation dates, and when he did appear, he promoted antisocial and even violent behavior.

Finally, while the trial court did not base its termination decision solely on father's extended incarceration, it was entitled to consider his incarceration in reaching the conclusion that termination was in A.R.'s best interests.

> While long-term incarceration does not, *per se*, authorize termination of parental rights . . . it is a valid and proper circumstance which, when combined with other evidence concerning the parent/child relationship, can support a court's finding by clear and convincing evidence that the best interests of the children will be served by termination.

Ferguson v. Stafford Cty. Dep't of Soc. Servs., 14 Va. App. 333, 340, 417 S.E.2d 1, 5 (1992).

"It is clearly not in the best interests of a child to spend a lengthy period of time waiting to find out when, or even if, a parent will be capable of resuming his [or his] responsibilities." Kaywood v. Halifax Cty. Dep't of Soc. Servs., 10 Va. App. 535, 540, 394 S.E.2d 492, 495 (1990).

> Virginia law recognizes the "maxim that, sometimes, the most reliable way to guage a person's future actions is to examine those of his past." Petry v. Petry, 41 Va. App. 782, 793, 489 S.E.2d 458, 463 (2003). "As many courts have observed, one permissible 'measure of a parent's future potential is undoubtedly revealed in the parent's past behavior with the child." Id. (citation omitted). "No one can divine with any assurance the future course of human events. Nevertheless, past actions and relationships over a meaningful period serve as good indicators of what the future may be expected to hold." Winfield v. Urquhart, 25 Va. App. 688, 696-97, 492 S.E.2d 464, 467 (1997) (citations omitted).

Toms, 46 Va. App. at 267-68, 616 S.E.2d at 770.

Here, father not only failed to secure employment or suitable housing, as required for A.R.'s return, he also continued to use and sell drugs. He acknowledged he would not be

available to care for A.R. for the next six years due to his incarceration.  At the time of the hearing, A.R. was living with her older sister in a foster family with whom she had bonded, and was doing well.

As clear and convincing evidence proved that father had, without good cause, failed to make substantial progress towards elimination of the conditions which led to A.R.'s foster care placement and that termination of father's parental rights was in A.R.'s best interests, the trial court did not err in terminating father's residual parental rights pursuant to Code § 16.1-283(C)(2).[2]  We affirm the decision of the circuit court.

<u>Affirmed.</u>

---

[2] Because we conclude that the evidence supported the trial court's termination of father's parental rights under Code § 16.1-283(C)(2), we need not address whether termination was also warranted pursuant to Code § 16.1-283(B).