COURT OF APPEALS OF VIRGINIA

Present: Chief Judge Decker, Judges Humphreys and O'Brien

NELY MARGARITA BONILLAS de CORDON

v.     Record No. 1536-18-4

FAIRFAX COUNTY DEPARTMENT OF
 FAMILY SERVICES

MEMORANDUM OPINION*
PER CURIAM
APRIL 9, 2019

FROM THE CIRCUIT COURT OF FAIRFAX COUNTY
David Bernhard, Judge

(Kimberly A. Chadwick; Darlene R. Langley, Guardian *ad litem* for
appellant; Langley & Langley, P.C., on brief), for appellant.

(Elizabeth D. Teare; May Shallal; John B. Jacob, Jr., Guardian *ad
litem* for the minor children; Office of the County Attorney, on
brief), for appellee.


Nely Margarita Bonillas de Cordon (mother) appeals the orders terminating her parental

rights to her children and approving the goal of adoption. Mother argues that the circuit court erred

by (1) consolidating the appeal of the termination of parental rights and permanency planning orders

of her youngest child with her other three children after the circuit court already had heard a day of

evidence in the matters regarding her older children; (2) terminating mother's parental rights and

approving the foster care goal of adoption "when the mother was compliant with the foster care

service plan and participating in all recommended services including specifically her mental health

treatment;" (3) terminating her parental rights and approving the goal of adoption when the Fairfax

County Department of Family Services (the Department) "failed to provide appropriate, available

and reasonable services designed to remedy the conditions that led to the children's placement or

---

* Pursuant to Code § 17.1-413, this opinion is not designated for publication.

continuation in foster care;" (4) terminating her parental rights and approving the goal of adoption when the Department "failed to present clear and convincing evidence regarding the mother's mental health, compliance with treatment, her relationship with the children, and her ability to care for her children during the one year time period immediately preceding trial;" (5) finding that it was in the children's best interests to terminate mother's parental rights and approve the goal of adoption when the Department "did not exhaust alternative, less drastic remedies, such as relative placement or the issuance of a protective order;" (6) terminating her parental rights and approving the goal of adoption for mother's youngest child because the Department "failed to present clear and convincing evidence to prove their case regarding this specific child;" and (7) "re-opening the evidence to admit [the Department's] documentary exhibits which it failed to introduce before resting its case in chief." Upon reviewing the record and briefs of the parties, we conclude that this appeal is without merit. Accordingly, we summarily affirm the decision of the circuit court. See Rule 5A:27.

BACKGROUND[1]

"On appeal from the termination of parental rights, this Court is required to review the evidence in the light most favorable to the party prevailing in the circuit court." Yafi v. Stafford Dep't of Soc. Servs., 69 Va. App. 539, 550-51 (2018) (quoting Thach v. Arlington Cty. Dep't of Human Servs., 63 Va. App. 157, 168 (2014)).

Father and Nely Margarita Bonillas de Cordon (mother) are the biological parents to four children, C., F., A., and R., who are the subject of this appeal. The Department first became

---

[1] The record in this case was sealed. Nevertheless, the appeal necessitates unsealing relevant portions of the record to resolve the issues raised by appellant. Evidence and factual findings below that are necessary to address the assignments of error are included in this opinion. Consequently, "[t]o the extent that this opinion mentions facts found in the sealed record, we unseal only those specific facts, finding them relevant to the decision in this case. The remainder of the previously sealed record remains sealed." Levick v. MacDougall, 294 Va. 283, 288 n.1 (2017).

involved with the family in December 2012, when it received a referral alleging mental abuse and neglect of C. and F.,[2] who were six and four years old at the time. The Department received allegations that mother assaulted father and was arrested. Two days later, mother took C. and F. and fled to El Salvador. She and the children eventually returned to Virginia.

In February 2014, the Department received a referral alleging mental abuse and neglect of C. and F. Another domestic violence incident occurred between mother and father in front of the children. Neither parent was willing to cooperate with the Department nor participate in mental health treatment. The Department placed the children in foster care.

In 2015, A. was born, and the Department returned C. and F. to mother and father's home for a trial home visit from October 16, 2015 to November 5, 2015, when it received a referral alleging physical neglect of C. and F. Mother left the house overnight with the infant, A., and she did not bring weather-appropriate clothes, extra diapers, or supplies for A. She left C. and F., who were nine and seven years old at the time, home alone. Mother reported various stories to the Department as to where she had been when she left C. and F. The social worker noticed that mother did not respond appropriately to all of the questions and occasionally would "stare off in space." The Department placed all three children in foster care. Father expressed concern about mother and her mental health and told the Department that he was not worried about the children because they were in foster care. The Department tried to discuss placement options with father, but he refused to make any decisions without mother.

The Department offered individual therapy for mother, father, C., and F., and it also provided intensive family preservation services. C. and F. returned home for a trial home visit in July 2016, while A. returned home for a trial home visit in August 2016. The Fairfax County

---

[2] A. and R. were not born yet.

Juvenile and Domestic Relations District Court (the JDR court) returned the children to their parents' custody on September 30, 2016.

In November 2016, the Department received a referral for physical neglect of C., F., and A. Mother physically assaulted father in front of the children, and she was arrested. Mother was held without bond for thirty days, placed on probation for twelve months, and ordered to participate in mental health treatment and anger management services. The Department encouraged father to obtain a protective order, but father refused to file for a protective order or create a safety plan for the children. The Department offered ongoing services and a referral for father and the children to stay at a domestic violence shelter, but he refused all services. The children initially stayed with their former foster parents for a fourteen-day respite.

The Department explored relative placements, including father's sister, but she had a small home and several of her own children. Mother could not identify any relatives. Father told the Department that the only possible relative to take the children would be his sister.

The Department returned the children to father's care until mother's release from incarceration because he refused to keep mother away from the children. Father expressed that his primary goal was to take care of mother, not the children. The children were placed back in foster care in December 2016. On January 26, 2017, the JDR court returned the children's custody to their parents.

On July 31, 2017, the Department received a referral alleging physical neglect of C., F., and A. At the time, mother was pregnant with R. and stopped taking her medication for her mental illness. On at least two occasions, mother left the children home alone for extended periods of time.

Father contacted the Department and expressed concern that mother was no longer seeing her therapist. When the social workers interviewed C. and F., they reported that mother had left

them alone more than once. C. complained that there was no food, other than cookies and ice cream, in the house. C. and F. described their mother as staring off and not responding to them when she was home. Neither C. nor F. wanted to be alone or go anywhere with mother for fear of what she might do. Both recalled the domestic violence incident that occurred in November 2016 and that father was bleeding a lot.

When the social workers interviewed mother, she admitted that she stopped taking her medications because she was pregnant. She was unable to provide any details to the social workers about her days with the children.

Father reported that mother was having an "emotional problem" because of the pregnancy. He stated that mother had been diagnosed with schizophrenia and that the doctor gave her the option of reducing her medication while she was pregnant. Mother, however, decided to stop taking the medication altogether, which father thought was a "bad decision." Father expressed concern about leaving the children home alone with mother while he went to work. Father acknowledged that mother left the children home alone for the day while he was at work. Father stated that there was no one with whom he could leave the children while he worked. The Department offered to assist with child care, but it would be a few days before it began. Father stated that he was unable to stay home and watch the children until child care would be available. Father also declined the Department's offer for rental assistance.

Father told the Department that he did not have any other family or friends who could watch the children. Father refused to allow the children to be placed in a foster care respite placement unless mother agreed. Eventually, mother and father agreed to a respite placement with the previous foster care family. The children cheered at the prospect of returning to the foster parents' home. When the social workers took the children to the foster care respite placement, A. was not wearing a diaper or underwear, and his shoes and socks were saturated

with urine. C. and A. were wearing clothes that were too small. Upon arrival at the foster home, the children immediately went to bed and fell asleep.

The Department explored placement options for the children, including placing them with church members, but the Department could not locate any viable placements. Therefore, the Department decided to remove the children, instead of continuing with a respite placement, because mother had violated her probation and father was "not prioritizing the needs of the children." Mother was arrested for violating her probation and subsequently hospitalized at Western State Hospital.

On August 2, 2017, the JDR court entered emergency removal orders and granted temporary custody of the children to the Department. At the adjudicatory hearing, the JDR court found that the children were abused or neglected and ordered mother to comply with mental health treatment. On October 13, 2017, the JDR court entered the dispositional orders.

The Department offered numerous services to the parents. The Department had referred mother and father for psychological evaluations, parent-child evaluations, individual therapy, couple's therapy, and parenting classes. The Department also referred mother for a neuropsychological evaluation and a psychiatric evaluation.

The Department arranged for supervised visitation for the parents. While mother was hospitalized, the Department had offered father opportunities to visit with the children twice a week, but father stopped visiting for a while when he refused to transport himself to the visits, after the Department learned that he had a car and a driver's license and offered to reimburse him for mileage. Father's visits recommenced later, but he only visited once per week.

In September 2017, the Department moved the children to a pre-adoptive home, where the foster parents spoke English and Spanish. The Department offered homebased services to

the children and the foster family to assist with the transition. The Department also referred C. and F. to therapy, as they had been experiencing anxiety with their situation.

In January 2018, the Department filed petitions to terminate mother and father's parental rights to C., F., and A. On February 20, 2018, the JDR court entered orders terminating mother and father's parental rights to C., F., and A. and approved the goal of adoption. Mother and father appealed the orders to the circuit court.

Meanwhile, the Department contacted father prior to R.'s birth to determine his plans for the child, and at first, father refused to speak with the Department. While mother was hospitalized, she gave birth to R. in December 2017. Once R. was ready to be discharged from the hospital, the Department placed R. in the same foster home as C., F., and A. The Department advised father about the upcoming hearing date and family partnership meeting for R., but father said that he was too busy at work and could not come. Father requested a paternity test, which revealed that he was R.'s biological father. Father also told the Department that he would be unable to care for R. for six weeks, which was the earliest age that R. could attend day care. Father attended few visitations with R. The JDR court adjudicated R. to be at risk of abuse and neglect and entered a dispositional order on February 9, 2018.

When mother was released from incarceration, mother met with the social worker regarding the children. The Department arranged for mother to visit with the children twice per week, and her visits were separate from father's visits. Mother also had an additional visit with R. during the week, but that was discontinued after she abruptly left for El Salvador in April 2018.

On May 18, 2018, the JDR court terminated mother and father's parental rights to R. and approved the goal of adoption. Mother and father appealed to the circuit court.

On May 30, 2018, the parties appeared before the circuit court to be heard on the appeals regarding C., F., and A. The Department presented evidence that mother participated in a parenting class, couple's counseling, individual counseling, and homebased services. Likewise, father participated in parenting classes, couple's counseling, and two rounds of individual therapy.

The Department provided evidence concerning the parents' visits with the children. Throughout the history of this case, mother did not regularly visit with the children, and when she did, she was "hesitant" with them. In February and March 2018, mother still required prompts from the supervisor as to how to interact with the children and detect their needs. Mother never could articulate the children's needs or why they were in foster care. In May 2018, father's visits were still chaotic. He focused too much attention on one child and not enough attention on the other three children. Father told the social worker that he intended to be with mother and hoped to have the children come home. His plan continued to be that mother would care for the children, while he was at work. Neither parent had progressed to having community visits or unsupervised visits. Also, neither parent had demonstrated that they had learned how to apply what they had learned from the various services provided.

The Department presented evidence about mother's mental health. Dr. Nesly Hneich, mother's psychiatrist, testified that she had treated mother between January and August 2017, until mother was hospitalized at Western State Hospital. Mother attended six out of thirteen visits. Mother's diagnosis was schizoaffective disorder, and Dr. Hneich provided psychiatric services, as well as medication management. Mother refused to take an injectable medication that Dr. Hneich originally suggested, but she did initially agree to a low dose of pills. Dr. Hneich found that mother had poor insight into her mental condition and displayed symptoms of flat affect and "bizarre behaviors," including erratic and disorganized behaviors, as well as

responding to internal stimuli. Dr. Hneich was concerned that when mother was pregnant with R., she did not receive prenatal care and had stopped her psychiatric medications. Dr. Hneich explained to mother that there was another medication that was safe to use during pregnancy, but mother refused it. Dr. Hneich also expressed concern that a patient who is violent toward one member of the family could be violent with other members of the family. Dr. Hneich testified that she did not know whether mother was ever going to be capable of handling the stressors involved with parenting one child, much less four children.

At the end of the day on May 30, 2018, the parties had not presented all of their evidence, so the matter was continued to August 22, 2018. Between the May 30, 2018 hearing and the August 22, 2018 hearing, R.'s appeal came to the circuit court. The circuit court consolidated R.'s case with C., F., and A.'s cases.

On August 22, 2018, the Department continued to present its evidence. Amy Anderson, a counselor, testified that she had been working with F. off and on since February 2015, and she also counseled C. and F. as siblings. Anderson worked with F. in play therapy, where F. displayed feelings of instability and fear that eventually improved over time spent in therapy. Anderson diagnosed F. with reactive attachment disorder and unspecified anxiety disorder. Anderson determined that C.'s prognosis was not as good as F.'s prognosis and that C. needed "a stable home with adults who . . . [were] able to provide adequate and consistent care . . . ." Anderson also opined that all of the children needed "two parents who [were] fully committed to caring for them" and who had "very good management skills."

Next, the Department offered the testimony of Damaris Cullerton, who had supervised mother and father's visits with the children since 2017. Cullerton explained that she had to set guidelines because initially, father brought too many sweets for the children. Cullerton also had to discipline the children if C. and F. acted inappropriately, because father would not always

intervene. Father did not have any structure or rules for the children, and he had difficulty handling all of the children at one time. Father was not comfortable with R., and Cullerton often had to take care of R., including changing his diaper, feeding him, and soothing him. Cullerton had to remind father that she was there to help him and not be a nanny. Although father was slow to respond to Cullerton's teaching, he did cooperate and was receptive to her instructions.

Mother, on the other hand, was resistant to Cullerton's instruction and advice. During the visits with all four children, mother's primary focus was on R. Cullerton noticed that A. never showed any affection toward mother or greeted her.

During the eighteen months that she supervised the visits, Cullerton did not notice much improvement in the parents' skills. Cullerton remained uncomfortable with the prospect of the parents having unsupervised visits.

The Department then presented evidence from Dr. William Ling, who had conducted several parent-child assessments with father and mother since 2014, as well as psychological evaluations of father, C., and F. Dr. Ling found that father "had tremendous struggle being able to balance his need to work a large number of hours in order to be able to financially provide for the family with the demand that would occur when his wife became incapacitated or unavailable to parent." Dr. Ling also found that father had "struggled to be able to set appropriate boundaries with his wife" because of her mental illness and refusal to take medication at times. He had difficulties "adequately provid[ing] for the safety of the children when she [became] disorganized." Dr. Ling saw father several times between 2014 and 2018, and he found father to be "remarkably stable from a psychological perspective and from a parenting perspective." Dr. Ling concluded that while father "has the appropriate capacities, he's been unable to implement them to a satisfactory degree." Father has not shown that he "can assume direct responsibility for the children as a single parent." Dr. Ling opined that father had prioritized his

job first and foremost, and then secondarily, his wife, and lastly, his children. Dr. Ling expressed concern that father could be too permissive and would not be able to guide and supervise the children as they grew older.

Dr. Ling found that mother had a "basic set of parenting skills that were appropriate, but her ability to apply those skills was greatly dependent on what her psychological or psychiatric status was from moment to moment." Dr. Ling noted that "[t]here were periods of time where she was clearly and significantly compromised in her functioning, not just as an individual but also her ability to parent her children." Dr. Ling expressed concern about mother's ability to stay on her medication and how her mental health had affected the children.

Dr. Ling recommended that the level of supervision not be reduced until mother and father demonstrated at least two years of stability and an ability to handle one child.

At the conclusion of the evidence presented on August 22, 2018, the circuit court continued the case to September 6, 2018, for the final day of evidence and argument. On September 6, 2018, father and mother moved to strike the evidence, which the circuit court denied.

Father did not present any evidence, but mother testified about her situation and that she wanted the children to come home. She verified that she regularly had been receiving her medication via injections since November 2017, but admitted that she was not participating in counseling. On cross-examination, mother acknowledged that she had missed her injections when she went to El Salvador.

Mother testified about the children and her mental health. When asked if the children had any special needs, mother replied, "They need a lot of love." Mother testified that she was capable of taking care of the children and knew that she needed to take her medication. Mother explained that the medication helped to keep her calm and reduced her urges to leave the house

or be violent. However, when asked, she could not identify her illness. She testified that if the children returned home and she became stressed, she would talk to father or take a walk "to get away from the stress."

After hearing the parties' arguments, the circuit court found that it was in the best interests of the children to terminate mother and father's parental rights under Code § 16.1-283(B) and (C)(2) and approve the goal of adoption. The circuit court entered the final orders, and mother and father timely noted their appeals.

ANALYSIS

"On review, '[a] trial court is presumed to have thoroughly weighed all the evidence, considered the statutory requirements, and made its determination based on the child's best interests.'" Castillo v. Loudoun Cty. Dep't of Family Servs., 68 Va. App. 547, 558 (2018) (quoting Logan v. Fairfax Cty. Dep't of Human Dev., 13 Va. App. 123, 128 (1991)). "Where, as here, the court hears the evidence *ore tenus*, its finding is entitled to great weight and will not be disturbed on appeal unless plainly wrong or without evidence to support it." Fauquier Cty. Dep't of Soc. Servs. v. Ridgeway, 59 Va. App. 185, 190 (2011) (quoting Martin v. Pittsylvania Cty. Dep't of Soc. Servs., 3 Va. App. 15, 20 (1986)).

*Consolidating the children's cases*

Mother argues that the circuit court erred by consolidating R.'s appeal with the appeals for C., F., and A. because the circuit court already had heard a day of evidence in the older siblings' cases before R.'s case came before the court. In her brief, mother stated that the Department's request to consolidate the appeals "merely confirms the Department's treatment of [R.] as nothing more than as [sic] 'add-on,' which tragically has been his status since birth." Mother did not include any legal authority to support her argument that the circuit court erred in consolidating the cases.

- 12 -

Mother has the burden of showing that reversible error was committed. See Burke v. Catawba Hosp., 59 Va. App. 828, 838 (2012). Rule 5A:20(e) mandates that appellant's opening brief include "[t]he standard of review and the argument (including principles of law and authorities) relating to each assignment of error." Mother did not comply with Rule 5A:20(e) because she provided no legal authority to support her argument that the circuit court erred in granting the motion to consolidate.

"[I]t is not the function of this Court to 'search the record for error in order to interpret the appellant's contention and correct deficiencies in a brief.'" West v. West, 59 Va. App. 225, 235 (2011) (quoting Buchanan v. Buchanan, 14 Va. App. 53, 56 (1992)). "Nor is it this Court's 'function to comb through the record . . . in order to ferret-out for ourselves the validity of [appellant's] claims.'" Burke, 59 Va. App. at 838 (quoting Fitzgerald v. Bass, 6 Va. App. 38, 56 n.7 (1988) (en banc)).

We find that mother's failure to comply with Rule 5A:20 is significant, so we will not consider her arguments regarding the consolidation of the cases. See Fadness v. Fadness, 52 Va. App. 833, 851 (2008) ("If the parties believed that the circuit court erred, it was their duty to present that error to us with legal authority to support their contention."); Parks v. Parks, 52 Va. App. 663, 664 (2008).

*Reasonable and appropriate services*

Mother argues that the circuit court erred by terminating her parental rights and approving the goal of adoption because the Department failed to provide mother with reasonable and appropriate services to remedy the conditions that led to, and required continuation of, the children's placement in foster care. Mother contends that the Department did not provide any services to her to reunify the family after it removed the children in 2017.

"'Reasonable and appropriate' efforts can only be judged with reference to the circumstances of a particular case. Thus, a court must determine what constitutes reasonable and appropriate efforts given the facts before the court." Harrison v. Tazewell Cty. Dep't of Soc. Servs., 42 Va. App. 149, 163 (2004) (quoting Ferguson v. Stafford Cty. Dep't of Soc. Servs., 14 Va. App. 333, 338 (1992)). The Department "is not required to force its services upon an unwilling or disinterested parent." Tackett v. Arlington Cty. Dep't of Human Servs., 62 Va. App. 296, 323 (2013) (quoting Harris v. Lynchburg Div. of Soc. Servs., 223 Va. 235, 243 (1982)); see also Logan, 13 Va. App. at 130.

Since 2014, the Department had provided this family numerous services. Over the years, the Department offered referrals and services for mental health treatment, individual counseling, couple's counseling, parenting classes, intensive family prevention services, psychiatric services, medication management, parent-child assessments, and psychological evaluations. In 2017, the Department referred mother to Dr. Hneich for psychiatric services and medication management. Dr. Hneich suggested an injectable medication for mother, but she refused it. Mother eventually stopped taking the prescribed pills when she became pregnant and refused all other medication despite the doctor's assurance that there was a safe medication to take during her pregnancy. It was not until mother went to Western State Hospital that she started an injectable medication in late 2017. Mother, however, again stopped taking her medication when she went to El Salvador.

The Department also provided supervised visitation opportunities for mother and father. Mother was even offered additional visitation with R., but then, she abruptly left for El Salvador and her additional visits stopped. Once she returned, she recommended visitation but only once per week. Cullerton testified that mother was resistant to any instruction or advice. Cullerton also testified about an incident that occurred in August 2018 when mother and father failed to supervise A., who was getting very close to a busy street during a visitation that occurred

- 14 -

outside. Cullerton testified about another recent incident when mother failed to recognize that R. was choking on his vomit, and Cullerton had to roll R. over and clear his airway.

At the time of the circuit court hearing, the Department had placed C. and F. in foster care three times, and A. in foster care twice, in the past four years. Furthermore, R. had been in foster care since his birth. Despite all of the services provided to mother over the years, she did not demonstrate that she could apply what she had learned. Mother never progressed to having unsupervised or community visits. In 2018, mother still could not keep the children safe. Dr. Ling concluded that mother had a "basic set of parenting skills that were appropriate, but her ability to apply those skills was greatly dependent on what her psychological or psychiatric status was from moment to moment."

Considering the circumstances of this case, the circuit court did not err in holding that the Department provided reasonable and appropriate services to the parents to help remedy the conditions that led to, and required the continuation of, foster care.

*Termination of mother's parental rights*

The circuit court terminated mother's parental rights pursuant to Code § 16.1-283(B) and (C)(2). Mother argues that the evidence was insufficient to support the termination of her parental rights because she complied with the services and her mental health treatment. She also asserts that the Department failed to offer additional evidence to support the termination of her parental rights for R., and instead, it relied on the evidence regarding C., F., and A.

Code § 16.1-283(C)(2) states that a court may terminate parental rights if:

> The parent or parents, without good cause, have been unwilling or unable within a reasonable period of time not to exceed 12 months from the date the child was placed in foster care to remedy substantially the conditions which led to or required continuation of the child's foster care placement, notwithstanding the reasonable and appropriate efforts of social, medical, mental health or other rehabilitative agencies to such end.

"[S]ubsection C termination decisions hinge not so much on the magnitude of the problem that created the original danger to the child, but on the demonstrated failure of the parent to make reasonable changes." Toms v. Hanover Dep't of Soc. Servs., 46 Va. App. 257, 271 (2005). "Considerably more 'retrospective in nature,' subsection C requires the court to determine whether the parent has been unwilling or unable to remedy the problems during the period in which he has been offered rehabilitation services." Id. (quoting City of Newport News Dep't of Soc. Servs. v. Winslow, 40 Va. App. 556, 562-63 (2003)).

The circuit court found that mother was "a nice lady" and loved her children. However, it also found that mother was "unable to make reasonable changes" to remedy her situation. The circuit court held that mother had not demonstrated a "long-term ability to . . . have her illness under control" and be able to parent the children appropriately. Although mother emphasized that she had taken her medication since November 2017, the Department also presented evidence that she missed a dosage when she went to El Salvador. Dr. Hneich discussed the importance of taking the medicine regularly because every time a patient discontinued her medication, the patient's mental condition would deteriorate and she would never have the same level of functionality again. Dr. Hneich was concerned about mother's ability to be compliant with her medication, given her history and lack of insight into her mental condition. That lack of insight was apparent when mother could not identify her illness when asked during the trial and simply said that she took the medication to feel calmer. Despite receiving psychiatric services and being hospitalized at Western State Hospital, mother still could not describe her mental illness and recognize the importance of taking her medication.

The Department also presented evidence that despite all of the services, including the assistance from Cullerton at supervised visitations, mother was unable to parent the children safely. As recently as August 2018, mother still did not supervise all of the children adequately

- 16 -

because she did not recognize when A. was close to a busy street during a visitation. Cullerton stated that mother was just staring into space at the time.

Moreover, mother could not express the children's needs, and simply stated, "They need a lot of love." When asked at the September 6, 2018 hearing what she would do if the children were home and she felt stressed, mother stated that she would speak with father or take a walk "to get away from the stress." However, one of the reasons that the children were in foster care was because mother would leave them home alone.

Contrary to mother's arguments, the Department also presented evidence about mother and her ability to parent R. Cullerton testified that during the visits in 2018, mother's primary focus was on R., not the other children. Cullerton described a visit in August 2018 when R. was fussy. Mother gave R. his bottle, but he continued to cry. He finally slept for a few minutes, but when he woke up, he started crying again. Mother gave him some baby food, and after he ate, he started crying again. Mother thought that maybe she should feed him again, but Cullerton intervened and said that he had had enough to eat. Cullerton suggested that mother change his shirt because it was soiled. Mother laid R. down and did not notice when R. started vomiting and choking. Cullerton had to take R. away from mother, roll him over, and clear his airway. Mother had not shown that she could take care of R. when he was in distress, which demonstrated that she still was unable to care for the children.

"Code § 16.1-283(C)(2)'s twelve-month time limit 'was designed to prevent an indeterminate state of foster care "drift" and to encourage timeliness by the courts and social services in addressing the circumstances that resulted in the foster care placement.'" Thach, 63 Va. App. at 171 (quoting L.G. v. Amherst Cty. Dep't of Soc. Servs., 41 Va. App. 51, 56 (2003)). "[T]he factfinder may consider evidence before or after the twelve-month time period in order 'to evaluate the *present* best interests of the child.'" Id. (quoting L.G., 41 Va. App. at 56).

- 17 -

"Virginia's jurisprudence recognizes that 'past actions and relationships over a meaningful period serve as good indicators of what the future may be expected to hold.'" Farrell v. Warren County Dep't of Soc. Services, 59 Va. App. 375, 425 (2012) (quoting Winfield v. Urquhart, 25 Va. App. 688, 695-96 (1997)); see also Geouge v. Traylor, 68 Va. App. 343, 375 (2017). Dr. Ling testified that the parties' four-year history with the Department was a good indicator of how they would do in the future, and it was not premature to decide to terminate mother's parental rights to R. after one month.

Here, the circuit court did not err in considering mother's history of mental health and her noncompliance with medication when it was determining the termination of her parental rights with respect to all four children. Her testimony indicated that she still lacked insight into her mental health situation. She also failed to take her medication as necessary when she went to El Salvador. Similarly, her parenting skills had not improved while the children were in foster care. Dr. Hneich questioned whether mother would ever be able to handle the stressors involved with parenting children, whether it was one child or four children. Mother's lack of ability to parent even one child was evident when she could not detect that R. was choking and in distress.

Based on the totality of the evidence, the circuit court did not err in terminating mother's parental rights under Code § 16.1-283(C)(2).[3]

"When a trial court's judgment is made on alternative grounds, we need only consider whether any one of the alternatives is sufficient to sustain the judgment of the trial court, and if so, we need not address the other grounds." Kilby v. Culpeper Cty. Dep't of Soc. Servs., 55 Va. App. 106, 108 n.1 (2009); see also Fields v. Dinwiddie Cty. Dep't of Soc. Servs., 46

---

[3] With respect to mother's challenge of the foster care goal of adoption, "[o]ur decision to affirm the termination order necessarily subsumes this aspect of [her] appeal because a preponderance-of-the-evidence standard governs judicial modifications of foster care plans." Toms, 46 Va. App. at 265 n.3.

Va. App. 1, 8 (2005) (the Court affirmed termination of parental rights under one subsection of Code § 16.1-283 and did not need to address termination of parental rights pursuant to another subsection). Therefore, we will not consider whether the circuit court erred in terminating mother's parental rights pursuant to Code § 16.1-283(B).

*Best interests of the children*

Mother argues that the circuit court erred in terminating her parental rights because the Department failed to prove that termination was in the best interest of the children.

"When addressing matters concerning a child, including the termination of a parent's residual parental rights, the paramount consideration of a trial court is the child's best interests." Tackett, 62 Va. App. at 319 (quoting Logan, 13 Va. App. at 128). "'[T]here is no simple, mechanical, cut and dried way' to apply the best interests of the child standard." Bristol Dep't of Soc. Servs. v. Welch, 64 Va. App. 34, 48 (2014) (quoting Peple v. Peple, 5 Va. App. 414, 422 (1988)). "Instead, 'the question must be resolved . . . in light of the facts of each case.'" Id. (quoting Toombs v. Lynchburg Div. of Soc. Servs., 223 Va. 225, 230 (1982)).

As noted above, the children had been in and out of foster care for four years. Anderson testified that C. and F. had special needs requiring therapy; however, F. was improving, while C.'s prognosis was not as good. The Department presented evidence that the children were doing well in school and in their foster home.

During the time that the children were in foster care, mother was unable to remedy the conditions that led to and required continued foster care. See Code § 16.1-283(C)(2). "It is clearly not in the best interests of a child to spend a lengthy period of time waiting to find out when, or even if, a parent will be capable of resuming his [or her] responsibilities." Tackett, 62 Va. App. at 322 (quoting Kaywood v. Halifax Cty. Dep't of Soc. Servs., 10 Va. App. 535, 540 (1990)).

Based on the circumstances of this case, the circuit court did not err in finding that it was in the children's best interests to terminate mother's parental rights.

*Relative placement*

Mother argues that the circuit court erred in terminating her parental rights and approving the goal of adoption because the Department had not explored "alternative, less drastic remedies, such as relative placement or the issuance of a protective order." Mother did not preserve this issue for appeal because it was not raised during her closing argument or in her objections to the final order.[4] See Lee v. Lee, 12 Va. App. 512, 515 (1991) (*en banc*).

"No ruling of the trial court . . . will be considered as a basis for reversal unless an objection was stated with reasonable certainty at the time of the ruling, except for good cause shown or to enable the Court of Appeals to attain the ends of justice." Rule 5A:18. "The Court of Appeals will not consider an argument on appeal which was not presented to the trial court." Tackett, 62 Va. App. at 315 (quoting Ohree v. Commonwealth, 26 Va. App. 299, 308 (1998)). "One of the tenets of Virginia's jurisprudence is that trial counsel must timely object with sufficient specificity to an alleged error at trial to preserve that error for appellate review." Perry v. Commonwealth, 58 Va. App. 655, 666 (2011). "The purpose of Rule 5A:18 is 'to ensure that the trial court and opposing party are given the opportunity to intelligently address, examine, and resolve issues in the trial court, thus avoiding unnecessary appeals.'" Friedman v. Smith, 68 Va. App. 529, 544 (2018) (quoting Andrews v. Commonwealth, 37 Va. App. 479, 493 (2002)).

Moreover, the Department presented evidence that it tried on numerous occasions over the years to seek alternative placement options. It asked mother and father for the names of

---

[4] Father briefly mentioned that the Department could have sought a protective order during his motion to strike, and mother adopted father's arguments. However, mother presented evidence after the circuit court denied the motion to strike, so her arguments were waived. See Taylor v. Commonwealth, 58 Va. App. 185, 189 (2011).

available relatives or church members.  It explored the idea of a sister in California, but to no avail.  Father and mother repeatedly said that they knew of no one who could care for the children.  Furthermore, in 2016, the Department encouraged father to obtain a protective order, but he refused to do so or create a safety plan for the children.  Contrary to mother's arguments, the Department clearly met its burden "to produce sufficient evidence so that the court may properly determine whether there are relatives willing and suitable to take custody of the child, and to consider such relatives in comparison to other placement options."  Castillo, 68 Va. App. at 567 (quoting Brown v. Spotsylvania Dep't of Soc. Servs., 43 Va. App. 205, 217 (2004)).

*Reopening the evidence*

Mother argues that the circuit court erred by reopening the evidence to admit the Department's documentary exhibits.  Although mother listed this argument as an assignment of error, she did not address it in her brief; therefore, the issue is waived and we will not consider it.  See Muhammad v. Commonwealth, 269 Va. 451, 478 (2005) ("Failure to adequately brief an assignment of error is considered a waiver.").

CONCLUSION

For the foregoing reasons, the circuit court's ruling is summarily affirmed.  Rule 5A:27.

Affirmed.