COURT OF APPEALS OF VIRGINIA

Present:  Judges O'Brien, AtLee and Senior Judge Haley
Argued at Richmond, Virginia

RICHMOND DEPARTMENT OF SOCIAL SERVICES

                                              MEMORANDUM OPINION* BY
v.      Record No. 0510-21-2                  JUDGE MARY GRACE O'BRIEN
                                              DECEMBER 6, 2022
JAZLENE WELLS AND
  DAMIEN ROANE

FROM THE CIRCUIT COURT OF THE CITY OF RICHMOND
D. Eugene Cheek, Judge

Keisha Dillard-Brady, Senior Assistant City Attorney (Lee L. Nelms,
Guardian *ad litem* for the minor child, on brief), for appellant.[1]

Dorothea Kate O'Leary; Paul S. Kellinger for appellees.

The Richmond Department of Social Services (the Department) appeals the circuit court's

dismissal of its petitions to terminate the residual parental rights of Jazlene Wells (mother) and

Damien Roane (father) and approve the goal of adoption. The Department contends that the court

erred in requiring proof by clear and convincing evidence that mother and father abused or

neglected their child (J.R.)[2] before their parental rights could be terminated. The Department also

challenges the court's refusal to terminate parental rights under Code § 16.1-283(B) and (C)(2).

BACKGROUND

On January 26, 2019, mother brought three-month-old J.R. to the hospital and reported that

he was acting "fussy." Medical personnel contacted the Department upon discovering that "the

---

* Pursuant to Code § 17.1-413, this opinion is not designated for publication.

[1] Pursuant to Rule 5A:19(d), the guardian *ad litem* filed a notice joining appellant's brief.

[2] We use the child's initials to protect his privacy.

child sustained multiple bruises," including "a bruise and scratch on the inside back part of his throat" and a bruise on his chest "the size of a thumb that was reddish purple in color." J.R. also had "scratch marks under both eyes." Neither parent could explain the child's injuries.

A social worker who saw J.R. at the hospital about 24 hours later did not observe the bruises and noted that "[t]he child did not appear to be in any pain or discomfort." However, the treating physician expressed concern about the scratch and bruise at the back of J.R.'s throat and requested that the parents bring him back for a follow-up skeletal survey.

After missing three appointments without explanation, father returned for J.R.'s skeletal survey approximately one month later. The survey revealed that the child had "multiple healing rib fractures" on the "second through sixth ribs" with a "suspected healing fracture of the anterior left seventh rib" and "a new fracture on [the] left wrist."

At the time of the skeletal survey, J.R. was living between the households of his paternal and maternal grandmothers and was cared for only by his mother, father, and grandmothers. None of his caregivers could explain how J.R. sustained the injuries.

The Department filed an abuse or neglect petition in the juvenile and domestic relations district court (JDR court), alleging that "[d]ue to the nature of the injuries sustained (old/new), the vulnerability of the [child], and the fact that the [child] had multiple caregivers[,] it [was] unsafe for the child to remain in the care of either parent." The JDR court entered an emergency removal order on February 21, 2019, placing J.R. in the Department's custody. The court subsequently adjudicated that the child was abused or neglected and entered a dispositional order on April 8 requiring the parents to comply with all of the Department's recommendations and referrals. Neither parent appealed the dispositional order.

In June 2019, the parents met with Takyra Jefferson, J.R.'s foster care worker, to discuss the services they needed to complete for J.R. to return to their care. After their meeting, Jefferson sent

each parent a letter reiterating these required services and providing contact information for the service providers.

The Department advised both parents to participate in parental support groups and, after completion, work with a parent coach. They had to attend individual therapy sessions, which had been referred in March 2019 when J.R. was placed in foster care. Mother and father also needed to show proof of stable housing and employment and submit to criminal background and child protective services (CPS) checks. After testing positive for marijuana use at a court hearing, both parents were directed to obtain a substance abuse assessment. Throughout this process, the Department arranged for the parents to have supervised visitation with J.R.

About five months later, Jefferson met with J.R.'s mother, father, and grandmothers. Neither parent had completed any of the services or attended any support groups, and, although they sporadically attended a few individualized therapy sessions, they missed many without calling to reschedule. Father submitted proof of employment but did not submit a criminal background check, CPS check, or proof of stable housing. Mother produced proof of employment and CPS check but failed to submit a criminal background check and evidence of stable housing. Neither parent had obtained a substance abuse assessment yet, and they had both failed to attend several scheduled assessments. Mother also incurred criminal assault charges.

At the meeting, Jefferson stressed the importance of timely complying with services and explained that "after a certain amount of months, we have to consider a different goal, if returning home is not an option, because of noncompliance." The Department identified June 30, 2020, as the target date for services to be completed.

On December 16, 2019, the JDR court held a permanency planning hearing. The goal remained for J.R. to return home or secure a relative placement. The court ordered the parents to

participate in the services required by the Department and obtain a psychological evaluation focused on parenting with Michele Nelson, Ph.D., a licensed clinical psychologist.

Dr. Nelson received the referral on January 27, 2020, but the parents did not appear for the evaluation until May 12, 2020—nearly five months after they had been ordered to do so and after they had missed an April appointment. Based on Dr. Nelson's recommendations, the Department referred mother to outpatient anger management therapy and father to parent coaching.

On May 20, 2020, in anticipation of a June 15 permanency planning hearing, the Department filed a new foster care plan requesting the JDR court change the goal to adoption, because "at that point [J.R.] had been in care for . . . over a year, and the services that [were] recommended to the parents had not been completed."

At the time of the June hearing, mother and father had completed only the psychological evaluations, co-parenting counseling, and substance abuse assessments. Mother also completed her motherhood support group. Neither parent, however, completed or regularly attended parent coaching or individualized therapy, despite Jefferson making financial arrangements for reduced payment. Additionally, father only irregularly attended his fatherhood support group sessions and mother still needed to finish the anger management sessions recommended by Dr. Nelson. According to Jefferson, the remaining services could take another eight months to a year to complete.

At the hearing, the Department asked the court to give the parents another opportunity to complete services and reinstate the goal of return home or relative placement, despite the May request to change the goal to adoption. The court denied the request, set a status hearing for July 13, and ordered the Department to file a new foster care plan. The Department filed a new plan with the goal of adoption, and it also filed petitions to terminate mother and father's parental rights.

- 4 -

The JDR court terminated mother and father's parental rights under Code § 16.1-283(B) and (C)(2) after a hearing on October 26, and it approved the new goal of adoption. Both parents appealed the termination of their parental rights to circuit court.

On April 2 and 3, 2021, after J.R. had been in foster care for over two years, the circuit court held a hearing de novo. At that time, mother and father still had not completed all services and father again tested positive for marijuana use. Indeed, some services had not yet been started as of the circuit court hearing.

At trial, the Department presented evidence from several of mother and father's service providers. Dr. Nelson, the clinical psychologist, testified that she diagnosed mother with "intermittent explosive disorder" due to her "significant temper outbursts." Dr. Nelson explained that "individuals with this disorder tend to have low frustration tolerance," and when "explosive anger [] is at a level that is problematic," it is harder for a parent "to respond in a calm fashion to [the child] when [the child] does not meet [] expectations or . . . acts out." Dr. Nelson testified that mother's inability "to understand [the child's] limitations as well as her intermittent explosive disorder and ongoing anger issue . . . would be considered high-risk factors . . . associated with parents who are . . . more likely than others to abuse children." Further, she testified that mother "did not see anger as an overall issue for her," despite the diagnosis, and "had not been working to improve."

Dr. Nelson described father's understanding about child development as "not great" but "coachable" and explained that parent coaching was an important service to teach him how to "relate well to" and "interact with" J.R.

Jefferson, J.R.'s foster care worker, testified about the services that remained incomplete. Jefferson noted that she had trouble communicating with both parents and had only "minim[al]" contact with them. Father changed his number several times without informing the Department, and

mother was not "able to talk to people on her telephone," so often the only way the Department could contact J.R.'s parents was "by sending letters or talk[ing] to the grandparents." Many of the phone conversations that did occur were "contentious."

Jefferson also testified that J.R. had been residing with the same family throughout his two years in foster care. She described J.R. as a "healthy, thriving little boy" in his foster family's care.

Tiffany James, a licensed professional counselor, provided co-parenting and nurturing counseling to mother and father. James testified that although the parents completed the co-parenting and nurturing counseling, it took them "about a year to do eight to twelve weekly sessions." Both parents were inconsistent in meeting with her. They missed appointments without calling ahead "about 30 percent of the time," but when they did participate, "they participated very well."

Robert Perkins, a fatherhood facilitator, testified about father's incomplete participation in the fatherhood support group. Due to the COVID-19 pandemic, the 12-hour program was conducted virtually through one-hour classes twice per week. Perkins testified his first contact with father was in May 2020, despite father's referral to the program in February 2019. Father finished only four of the 12 required course hours. When Perkins stressed to father that he needed to complete the course by the end of June 2020 because the program was losing its funding, father initially agreed to do so; however, Perkins had no contact with father after the first week of June. During the four sessions he attended father was not responsive, and Perkins "didn't think [father] was interested [in] complet[ing] the classes."

The Department also presented evidence from the National Counseling Group, which provided therapy, parent coaching, and supervised visitation services to mother and father. Amber Jennings, mother's anger management therapist, testified that when mother started therapy in August 2020, she "did really well" and "attended every week." Mother's attendance declined,

however, and she missed five consecutive sessions, not meeting with Jennings again until October 19. Mother's attendance never improved, despite Jennings offering virtual options. Jennings finally discharged mother from therapy in February 2021 due to noncompliance.

Blair Gardner, a mental health counselor, provided parent coaching to mother. From August to October 2020, mother made "no progress" and participated only minimally. Mother was initially reluctant to let Gardner attend visitation with J.R. and offer advice, but she ultimately allowed it. Although mother did not complete coaching, Blair observed that her "communication ha[d] improved greatly" and she interacted with J.R. "very well."

Eric Carlson, who supervised mother and father's visitation with J.R., testified that from May 2019 to March 2021, the parents were scheduled to visit with J.R. 65 times. Of the 65 visits, mother missed 13, providing notice only twice, and was late 17 times. Father missed seven visits, providing notice only twice, and was late 23 times.

Carlson testified concerning behavior he observed during visitation. During a July 2020 visit, J.R. arrived crying and upset, but mother made no effort to console him, appearing "withdraw[n]" and "standoffish." In August 2020, J.R. again arrived crying. Mother and father responded poorly, appearing "frustrated." Mother used profanity and an "angry [and] agitated tone of voice" in front of J.R. who "was upset and appeared distressed."

Finally, several witnesses testified that mother and father had challenges maintaining stable housing.

At the close of the Department's case, mother moved to strike. The court expressed skepticism about the sufficiency of the evidence to support terminating parental rights and stated that "it's [the Department's] burden, clear and convincing, that the bruises and fractures—bruises and fractures come in different kind of ways. And you have not documented exactly how it happened or what happened." When the Department noted that the abuse or neglect dispositional

order had not been appealed and was not before the court to be "relitigated," the court disagreed, stating, "You have to prove, by clear and convincing evidence, that the neglect, abuse, likely condition—you have to prove that serious and substantial threat of his life."

The court also questioned whether termination was in J.R.'s best interests and noted that "being with the biological parents is very important to some people. Some people, they spend their life looking for their biological parents. . . . Kids grow up all the time and they ask for their roots, they ask for their biology." The court further opined that mother and father had a "relationship" with J.R. and they were capable of improvement. When the Department referred to the delays and failure to comply with services and argued that it was not in J.R.'s best interests to "languish" in foster care, the court responded, "I think the question is: How long would [J.R.] want to wait to get his parents to have him home?" The court also expressed concern that J.R. would grow up "to hate[] the State" if his parents' rights were terminated.

The court nevertheless held that the Department had presented a prima facie case and denied the motion to strike.

Mother then testified on her own behalf. She acknowledged her difficulties in maintaining stable housing. She testified that she lived in her mother's home until the "end of 2020," when a housefire displaced them. In February 2021, mother told Jefferson and her parent coach that she could not take care of J.R. because she was "all over the place," did not "have anywhere to stay," and was "living in various places week to week." Mother testified that she moved in with a female acquaintance named "Henderson" in March 2021 who had a place for J.R. in her home. Although mother stated that she has known Henderson since she was 12 years old and thinks of her as a grandmother, mother could not provide Henderson's full name.

Mother acknowledged that she did not comply with services for the first "six, seven months" following removal. According to mother, she delayed because she was taking two classes, "plus

[she was] seeing [the child], so it was a lot on [her] plate." Mother stated that her "communication skills [were] better" and she was "willing to do whatever" the court ordered, or the Department required, so that the child could be returned to her care.

Father called himself and his mother as witnesses. Father previously lived with his mother; however, at the time of trial, he was living with his aunt who had not yet undergone a background check.

Like mother, father also acknowledged that "it took [him] a significant amount of time to even begin to engage in [] services." Father testified that he delayed because he was 17 years old when J.R. was born, but he had grown up in the years that J.R. was in foster care. Father also claimed that he was not required to finish individual therapy because the Department only "recommended" that he go, despite the court order to "comply with all services, recommendations, and referrals offered" by the Department. Father also acknowledged testing positive for marijuana and admitted that he had multiple positive tests in the JDR court. Father's mother testified that she did not know how J.R. sustained his injuries, but she loved J.R. and he could live with her.

At the end of the case, the court ruled that the Department failed to carry its burden under either Code § 16.1-283(B) or (C)(2). The court determined that the Department failed to prove that mother and father were the individuals responsible for causing J.R.'s injuries, which the court considered to be a prerequisite for termination. The court cited due process concerns and stated, "In this [c]ourt, it matters who did it and when." It found that the Department was required to present "more substantial evidence implicating each one of the persons."

The court also ruled that the Department did not prove that termination was in J.R.'s best interests. The court referred to J.R. calling mother "mom," found that there was evidence J.R. and his biological family had a "connection," and pointed out that the grandmothers had raised "about ten [other] children" without claims of abuse. The court further found that the child's injuries did

not amount to a "death-like situation" and commented that "you've got a bruise and you've got fractures. And fractures are easy to occur. There are people walking down the street and get fractures or trip up and get fractures. So there's no explanation of that fracture process." The court also noted that father took J.R. to the skeletal survey and queried, "[W]ould somebody beat up a kid and then take him to the hospital?"

Five months later, on September 20, 2021, the court entered the final order denying the Department's petition to terminate mother and father's parental rights and remanding the case to the JDR court.

The Department moved for reconsideration, and the court held a hearing on October 4, 2021. During the hearing, the Department notified the court that mother had outstanding warrants for maliciously shooting into an occupied vehicle, malicious wounding, and use of a firearm during the commission of a felony for "events" that occurred in June 2021. At the end of the hearing, the circuit court denied the Department's motion.[3] This appeal followed.

ANALYSIS

To terminate parental rights under Code § 16.1-283(B), the Department must prove by clear and convincing evidence that termination is in the child's best interests and that (1) "[t]he neglect or abuse suffered by such child presented a serious and substantial threat to his life, health[,] or development," and (2) "[i]t is not reasonably likely that the conditions which resulted

---

[3] The Department did not ask the court to stay or suspend the final order in its motion to reconsider. The court denied the Department's motion by written order on October 21, 2021, after it no longer had jurisdiction over this suit under Rule 1:1(a). "Neither 'the filing of post-trial or post-judgment motions, nor the trial court's taking such motions under consideration, *nor the pendency of such motions* on the twenty-first day after final judgment[,] is sufficient to toll or extend the running of the twenty-one day time period of Rule 1:1.'" *Wells v. Shenandoah Valley Dep't of Soc. Servs.*, 56 Va. App. 208, 213 (2010) (quoting *Super Fresh Food Mkts. of Va., Inc. v. Ruffin*, 263 Va. 555, 560 (2002)). Accordingly, we will not consider the order denying the Department's motion to reconsider.

- 10 -

in such neglect or abuse can be substantially corrected or eliminated so as to allow the child's

safe return to his parent or parents within a reasonable period of time."[4]

"On review, '[a] trial court is presumed to have thoroughly weighed all the evidence,

considered the statutory requirements, and made its determination based on the child's best

interests.'" *Castillo v. Loudoun Cnty. Dep't of Fam. Servs.*, 68 Va. App. 547, 558 (2018) (alteration

in original) (quoting *Logan v. Fairfax Cnty. Dep't of Hum. Dev.*, 13 Va. App. 123, 128 (1991)).

"Therefore, in a case involving termination of parental rights, '[t]he trial court's judgment, "when

based on evidence heard *ore tenus*, will not be disturbed on appeal unless plainly wrong or without

evidence to support it."'" *Eaton v. Washington Cnty. Dep't of Soc. Servs.*, 66 Va. App. 317, 324

(2016) (alteration in original) (quoting *Fields v. Dinwiddie Cnty. Dep't of Soc. Servs.*, 46 Va. App.

1, 7 (2005)). A court's conclusions about questions of law are reviewed de novo. *Rusty's*

*Welding Serv., Inc. v. Gibson*, 29 Va. App. 119, 127 (1999) (en banc).

## I. Proof of Abuse or Neglect

The Department first argues that the issue of abuse or neglect was not before the circuit

court because neither mother nor father appealed the JDR court's dispositional order entered

following the abuse or neglect adjudication.[5] By failing to appeal the dispositional order, they

argue, mother and father "relinquished any claim that [the Department] did not prove J.R. was

abused or neglected."

The JDR court's dispositional order reflects that J.R. was adjudicated as abused or

neglected pursuant to Code § 16.1-252(G), which requires the JDR court to "determine whether

---

[4] Although the Department also challenges the court's dismissal of its petition to terminate parental rights under Code § 16.1-283(C)(2), we need not address that provision based on our analysis of Code § 16.1-283(B). *See Kilby v. Culpeper Cnty. Dep't of Soc. Servs.*, 55 Va. App. 106, 108 n.1 (2009).

[5] Under Code § 16.1-278.2(D), "[a] dispositional order entered pursuant to this section is a final order from which an appeal may be taken in accordance with § 16.1-296."

the allegations of abuse or neglect have been proven by a preponderance of the evidence." By contrast, in a termination of parental rights proceeding under Code § 16.1-283(B), the Department must establish abuse or neglect by clear and convincing evidence. *See* Code § 16.1-283(B)(1).

Due process mandates this higher standard. In *Wright v. Alexandria Division of Social Services*, 16 Va. App. 821 (1993), we acknowledged that the Due Process Clause of the Fourteenth Amendment protects a parent's right to the "the companionship, care, custody[,] and management of his or her children." *Id.* at 829 (quoting *Stanley v. Illinois*, 405 U.S. 645, 651-51(1972)). However, the right is not "absolute" and must be "balanced against competing legitimate interests of the state to protect the welfare of its citizens." *Id.* Accordingly, "[b]efore a state may sever completely and irrevocably the rights of a parent in his or her natural child, due process requires that the state support its allegations of parental unfitness by at least clear and convincing evidence." *Id.* This Court applied that standard in *Farrell v. Warren County Department of Social Services*, 59 Va. App. 375, 404-05 (2012), where we stated:

> [A] trial court cannot terminate a parent's rights to his child based solely upon a finding in a prior hearing that the child was abused or neglected. The trial court must find that the abuse or neglect rose to a level that presented a substantial threat to the child's life, health, or development, and Code § 16.1-283(B)(1) requires that this finding be made *upon a showing of clear and convincing evidence*. . . . Thus, a trial court cannot base its decision to terminate parental rights on a previous preliminary finding, (by the preponderance of the evidence), that a child is abused or neglected.

Under this precedent, and the plain language of Code § 16.1-283(B), a failure to appeal a prior abuse or neglect adjudication and subsequent dispositional order does not render abuse or neglect conclusively established in a termination case under Code § 16.1-283(B). The court did not err by requiring the Department to prove that J.R was "neglected or abused" and that "[t]he neglect or abuse suffered by [J.R.] presented a serious and substantial threat to his life, health[,]

or development," because the termination statute requires clear and convincing evidence of these facts. Code § 16.1-283(B)(1).

Our inquiry does not end there, however. The court dismissed the case in part because it also found that the Department did not prove that mother or father "were, in fact, the perpetrators" of any abuse. The court ruled that the Department had to prove "exactly how [the injuries] happened or what happened," and it explained that "[i]n this [c]ourt, it matters who did it and when."

Code § 16.1-228(1) defines an "[a]bused or neglected child" as any child "[w]hose parents or other person responsible for his care creates or inflicts . . . or allows to be created or inflicted upon . . . a physical . . . injury by other than accidental means, or creates a substantial risk of death, disfigurement[,] or impairment of bodily or mental functions."

Although Code § 16.1-283(B) refers to a "neglected or abused" child, nothing in the statute requires the Department to specifically prove who injured the child. It is enough that the child was injured by the parents, or someone whom the parents had deemed "responsible for his care." Code § 16.1-228(1).[6] Alternatively, it was sufficient for the Department to show that mother or father had allowed J.R.'s injuries to happen and did nothing to put a stop to the abuse or prevent future abuse from occurring, or that they created such "a substantial risk of death, disfigurement or impairment of bodily or mental functions" that J.R. continued to find himself in situations where he was repeatedly severely injured. *Id.* The circuit court failed to consider whether J.R.'s circumstances met these other definitions, narrowly focusing on whether mother or father had directly caused the fractures and bruising J.R. suffered.

---

[6] Mother and father agreed that J.R. was always either in their care or in the care of his maternal or paternal grandmother; there was no evidence that anyone else had access to the child.

Thus, the court erred by imposing the added requirement that the Department prove precisely which one of J.R's four caretakers was responsible for his injuries, a requirement not included in Code § 16.1-228(1) or Code § 16.1-283(B). We next turn to whether the court's dismissal of the Department's termination petition was plainly wrong or without evidence to support it.

## II. Termination under Code § 16.1-283(B)

### A. Code § 16.1-283(B)(1)

The Department was required to prove by clear and convincing evidence that "[t]he neglect or abuse suffered by [J.R.] presented a serious and substantial threat to his life, health[,] or development." Code § 16.1-283(B)(1).

Clear and convincing evidence is an "intermediate" standard of proof, "being more than a mere preponderance, but not to the extent of such certainty as is required beyond a reasonable doubt as in criminal cases. *It does not mean clear and unequivocal*." *In re Scott*, 297 Va. 166, 185 (2019) (quoting *In re Watford*, 295 Va. 114, 124 n.12 (2018)). "[T]he persuasive quality of clear-and-convincing evidence must establish that 'the thing to be proved is highly probable or reasonably certain.'" *In re Brown*, 295 Va. 202, 227 (2018) (quoting *Clear and Convincing Evidence*, *Black's Law Dictionary* (10th ed. 2014)).

The unrebutted evidence established that J.R. was first brought to the hospital with multiple bruises, including "a bruise and scratch on the inside back part of [his] throat." More significantly, the skeletal survey revealed that sometime during the first three months of his life, J.R. sustained at least five fractured ribs, with a "suspected healing fracture" on a sixth rib, and a fresh fracture on his left wrist. The fact that the fractures were in various stages of healing and that J.R. had sustained a recent wrist fracture, shows that the injuries did not result from a one-time accident. These unexplained fractures on a three-month-old infant "presented a serious

and substantial threat to his life, health[,] or development," Code § 16.1-283(B)(1), despite the court's comments that the injuries did not amount to a "death-like situation," "fractures are easy to occur," and "people walk[] down the street and get fractures or trip up and get fractures."

Based on our review of the record, we conclude that the court's decision was plainly wrong and without evidence to support it; the evidence clearly and convincingly established that J.R. was an abused or neglected child and his injuries presented a "serious and substantial threat to his life, health[,] or development." Code § 16.1-283(B)(1).

## B. Code § 16.1-283(B)(2)

Code § 16.1-283(B)(2) requires the Department to establish that "[i]t is not reasonably likely that the conditions which resulted in such neglect or abuse can be substantially corrected or eliminated so as to allow the child's safe return to his parent or parents within a reasonable period of time." Proof that the "parent or parents, without good cause, have not responded to or followed through with appropriate, available[,] and reasonable rehabilitative efforts on the part of social, medical, mental health[,] or other rehabilitative agencies designed to reduce, eliminate[,] or prevent the neglect or abuse of the child" constitutes "prima facie evidence" of this basis for terminating parental rights. Code § 16.1-283(B)(2)(c).

The Department's evidence established that for almost two years before the circuit court trial, the parents failed to follow through with services. Indeed, many services essential to ensuring J.R.'s safety and well-being remained incomplete or yet to be started at the time of the circuit court trial. Dr. Nelson expressed concern that mother's inability "to understand [the child's] limitations as well as her intermittent explosive disorder and ongoing anger issue" would put her at a high-risk to abuse children. Anger management therapy was a critical service to ensure mother's anger issues would not cause J.R. future harm, but mother had been discharged from therapy due to noncompliance. Additionally, Dr. Nelson testified concerning father's inability to understand J.R.'s

- 15 -

development and identified parent coaching as an important service. Father, however, failed to complete his fatherhood support group, a prerequisite to parent coaching. Indeed, his fatherhood support group counselor testified that he "didn't think [father] was interested [in] complet[ing] the classes."

The court's finding that the parents had "good cause" for their noncompliance was plainly wrong and without supporting evidence. At most, the record reflects that mother and father relied only on their youth and immaturity and argued that "there was a lot on their plate." Although they claimed they would improve if given yet another chance, "Virginia's jurisprudence recognizes that 'past actions and relationships over a meaningful period serve as good indicators of what the future may be expected to hold.'" *Farrell*, 59 Va. App. at 425 (quoting *Winfield v. Urquhart*, 25 Va. App. 688, 695-96 (1997)).[7] The court discounted the ample evidence detailing the range of services offered, the numerous accommodations that service providers made to increase accessibility, and the length of time these services were available. The court failed to give sufficient weight to the desultory manner in which mother and father approached services and failed to adequately consider that many services remained incomplete, meaning that neither mother nor father possessed or were working on the skills necessary to ensure J.R.'s well-being.

In sum, the evidence established that "it is not reasonably likely that the conditions which resulted in such neglect or abuse can be substantially corrected or eliminated so as to allow the child's safe return to his parent or parents within a reasonable period of time," and mother and father's failure to follow through with the rehabilitative services offered to them was without good cause. Code § 16.1-283(B)(2), (B)(2)(c).

---

[7] We also note that during the hearing on the motion to reconsider, the Department proffered that mother had outstanding warrants for maliciously shooting into an occupied vehicle, malicious wounding, and use of a firearm during the commission of a felony.

## C.  J.R.'s Best Interests

Finally, the court erred in finding that the Department failed to prove that termination was in J.R.'s best interests.

"When addressing matters concerning a child, including the termination of a parent's residual parental rights, the paramount consideration of a trial court is in the child's best interests." *Logan*, 13 Va. App. at 128.  Although "trial courts are vested with broad discretion in making the decisions necessary to guard and to foster a child's best interests," *id.* (quoting *Farley v. Farley*, 9 Va. App. 326, 328 (1990)), a court abuses its discretion by disregarding proper factors and giving significant weight to improper considerations, *Lawlor v. Commonwealth*, 285 Va. 187, 213 (2013).

Here, the court abused its discretion by failing to adequately consider relevant factors and by giving significant weight to improper considerations.  *See id.*  The court failed to give adequate weight to the evidence of mother and father's noncompliance with services designed to ensure J.R.'s safety and their lack of urgency in engaging with services.  "It is clearly not in the best interests of a child to spend a lengthy period of time waiting to find out when, or even if, a parent will be capable of resuming his [or her] responsibilities." *Kaywood v. Halifax Cnty. Dep't of Soc. Servs.*, 10 Va. App. 535, 540 (1990).  Moreover, the evidence showed that J.R. was a "healthy, thriving little boy" in his foster family's care.  *See, e.g.*, *Fields*, 46 Va. App. at 10 (finding that termination was in a child's best interests where the child had been in his foster family's care since birth, was "thriving in every way," had never lived with or spent significant time with mother alone, and could not be returned to her care due to her failure to accept and obtain treatment for her mental illness); *Eaton*, 66 Va. App. at 331 (discussing relevant and appropriate factors a court should consider when determining what is in a child's best interests).

Instead, the court gave significant weight to evidence showing that J.R. called mother "mom," that the paternal and maternal grandmothers had raised other children without claims of abuse, and that father had taken J.R. to the hospital for the skeletal survey. The court also minimized the severity of J.R.'s injuries and improperly speculated about abstract future possibilities, such as J.R. growing up to "hate[] the State" and wonder about his biological parents. *Cf. Dung Thi Thach v. Arlington Cnty. Dep't of Hum. Servs.*, 63 Va. App. 157, 173 (2014) (finding error where a court determined a child's best interests by "rel[ying] heavily" on a parent's immigration status, "insufficient employment verification," and a finding that the child's foster family could provide more stability than the parent).

CONCLUSION

Based on the record before us and applicable law, we are compelled to hold that the court's decision to dismiss the termination petition was plainly wrong and without evidence to support it because the Department's evidence established the elements of Code § 16.1-283(B) by clear and convincing evidence. Accordingly, we reverse the judgment of the circuit court, terminate mother and father's parental rights under Code § 16.1-283(B), approve the Department's foster care goal of adoption, and remand the matter to the circuit court for any other further proceedings as necessary. *See* Code § 16.1-283(F).

*Reversed and remanded.*